Thomas Carlton **WANSLEY**

v.

Andrew P. **MILLER** et al.

Civ. A. No. 545–71–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 1, 1973.

Philip J. Hirschkop, Alexandria, Va., William M. Kunstler, New York City, for petitioner.

Gilbert Haith, Vann H. Lefcoe, Richmond, Va., for respondents.

## MEMORANDUM

MERHIGE, District Judge.

Thomas Wansley, a black Virginia prisoner, has filed a complaint in the form of a petition for a writ of habeas corpus and for declaratory and injunctive relief. The nature of his present confinement arises from State court convictions for rape and robbery. The complaint is in two counts: Count 1 seeks a judgment declaring certain practices of the Commonwealth of Virginia to be unconstitutional; and in Count 2 he seeks release from his instant confinement. Jurisdiction of his request for habeas corpus relief is attained pursuant to 18 U.S.C. §§ 2241, 2254. The Court's jurisdiction with regard to his other claims arises pursuant to 42 U.S.C. §§ 1981, 1983 et seq., the Constitution of the United States, and 28 U.S.C. §§ 1343, 2201 and 2202.

Since the Court's determination of many of the issues raised with reference to the habeas corpus matter will be determinative of Wansley's request for declaratory judgments, the Court deems it appropriate to first address itself to those issues material to the relief sought

under the Court's habeas corpus jurisdiction.

The petitioner has raised all pertinent issues on appeal to the highest court of Virginia, hence the requirement of exhaustion of remedies has been met, 18 U.S.C. § 2254, and the issues are ripe for determination on the merits.

The Court has examined the voluminous record of the State proceedings, including exhibits and other documents presented to the Court, and counsel have been heard on oral argument. On the basis of the entire record herein the Court makes the following Findings of Fact and Conclusions of Law:

*Uncontroverted Facts*

The uncontroverted facts before the Court may be summarized as follows: On December 5, 1962, one Annie Carter, an adult white woman of Lynchburg, Virginia, reported that she had been raped and robbed by a Negro. Thereafter the Lynchburg police entered into an intensive investigation by virtue of which the petitioner, then 16 years of age, was apprehended, and charged with several crimes including the rape and robbery of Miss Carter and rape of another woman, Mrs. Kyoko Fleshman. During the investigative period he was interrogated for several hours without counsel and made an allegedly damaging admission to his mother in the presence of a probation officer of the Juvenile and Domestic Relations Court of the City of Lynchburg. The legality of the subsequent introduction of that admission upon trial has been advanced to the Court as one ground for granting the writ.

Because at the time of his arrest plaintiff was only 16 years of age, pursuant to the provisions of Title 16.1, § 158 of the Code of Virginia he was placed under the jurisdiction and supervision of the Juvenile and Domestic Relations Court of the City of Lynchburg. Although plaintiff's certification hearing was not scheduled until December 13, 1962, plaintiff alleges that the Juvenile Court Judge, defendant Wingo, stated publicly on December 10, 1962, that he had already decided that the plaintiff would be treated as an adult, which allegation is denied by the defendant Wingo. On December 13, 1962, after a hearing, plaintiff was officially certified to the Corporation Court of Lynchburg for trial as an adult. No transcript or recording was made of the certification proceeding. In addition, plaintiff alleges that defendant Wingo failed to set forth in his certification order any reason(s) for his decision to waive jurisdiction. Contending he had no transcript to review the evidence nor the benefit of any explanation rendered by Judge Wingo for his decision, plaintiff filed a pretrial motion to examine the Juvenile Court Judge. This motion was denied. The aforementioned certification procedures are challenged herein and advanced by the petitioner as a ground for granting the writ.

In January 1963, Wansley was indicted by a grand jury for the rape and robbery of Miss Carter. He has challenged, herein, the legality of the grand jury on the basis of unrepresentative composition, lack of a grand jury transcript, and/or denial of his trial court motion to examine the grand jurors. He was arraigned and pled not guilty. He was, in addition, indicted for the rape of Mrs. Fleshman. He was tried before a jury, found guilty on all charges, and sentenced to death for each rape and 20 years for the Carter robbery. On September 21, 1964, both convictions were reversed by the Virginia Supreme Court. (In November 1966, upon motion of the Commonwealth, the Fleshman charge was *nolle proseq'd.*)

On July 7, 1965, prior to retrial the petitioner, without success, presented several motions, including one for change of venue, on the ground that adverse publicity precluded the opportunity for a fair trial.

He was, in October 1966, retried on the Carter robbery charge before a jury which failed to agree upon a verdict, and a mistrial was declared.

Prior to a third trial on the Carter charges, Wansley again moved for a

change of venue. A lengthy pretrial hearing was held and the motion was again denied. The third trial began in March 1967 and resulted in a guilty verdict on both charges. The jury recommended sentences of life imprisonment on each charge, but the Court reduced the life sentence in the robbery matter to 20 years. The petitioner subsequently unsuccessfully appealed to the Virginia Supreme Court, raising the issues herein considered.

The record reflects that there was an enormous amount of newspaper publicity in the local press, giving rise to the petitioner's motions for a change of venue, the nature and effect of which will be scrutinized *infra*.

While petitioner has assigned numerous grounds for habeas corpus relief, those issues which the Court believes merit discussion will be addressed separately with the Court stating its findings of fact and conclusions of law *in seriatem*.

## I. VENUE

Petitioner alleges and argues that the manner in which the Lynchburg press addressed itself to matters involving Negroes, and more specifically Wansley and the charges with which he was faced, as well as their references to and description of his counsel, precluded the possibility of a fair trial in Lynchburg, Virginia, and that accordingly, the trial court's denial of a motion for a change of venue amounted to a deprivation of his constitutional rights.

The record before this Court is shocking as to the nature and amount of prejudicial pre-trial publicity given the matters by the Lynchburg press. Same is all the more shocking when viewed, as this record proves, that for some time prior to Wansley's arrest the policies of the Lynchburg newspapers were such as to be described in a document styled "An open letter to the people of Lynchburg" and signed on behalf of the local Chamber of Commerce, the Retail Merchants' Association, Central Virginia Industries, the Lynchburg Board of Real-

tors, and more than sixty prominent Lynchburg citizens, as creating a situation injurious to the good relationships which had existed among the people of the community. The document expresses the hope that the Negro citizens "will be encouraged by the knowledge that there are many thoughtful white citizens in this community who appreciate their continued willingness, in spite of repeated indignities by the newspapers, to help promote a more wholesome climate throughout the City of Lynchburg." The document expresses the judgment of the writers that the Lynchburg newspapers were contributing to the frustrations and bitterness developing among the Negro citizens by the papers' policies.

 A finding that the nature and amount of adverse pre-trial publicity was such as to preclude the petitioner from obtaining a fair and impartial jury is in actuality a finding of "mixed law and fact," see Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

The Court is satisfied in this instance that the refusal of the motion for a change of venue was violative of petitioner's constitutional rights. The Court's conclusion as to this finding while induced by the entire record, is perhaps the more readily understandable by reason of the following specificities:

### A. Publicity.

Lynchburg at the time pertinent hereto had two main newspapers, the *Lynchburg News*, a morning paper, and *Lynchburg Daily Advance*, an evening paper, both under common ownership and management. The file reflects that the sheer quantity of coverage of the Wansley matters was enormous. While the Court appreciates that it does not have all the relevant newspaper articles before it, its conclusions as to quantity and tenor of same is represented by the fact that:

1. The uncontradicted assertion thereof by the petitioner and admission in response thereto by the respondents that said news coverage was "extensive."

2. The testimony of *News* and *Daily Advance* personnel upon pretrial examination (notably Gunn, Scruggs, Peace and Glass) with reference to the content of numerous articles (T. 181, et seq.).

3. Of the 43 veniremen who were questioned about their familiarity with press coverage in the Lynchburg papers, 40 had positive recollection of said coverage. At least 16 veniremen believed him guilty because of newspaper articles, or were not sure they could put aside what they had read in the newspapers.

In addition to concluding that there was extensive pretrial publicity, which included news coverage subsequent to his first and second trials on the Carter charges, the Court also finds that said publicity emanating from the Lynchburg newspapers was both inflammatory and highly prejudicial to the petitioner as well as to one of his counsel, William Kunstler. Reference to his counsel obviously contributed to the totality of circumstances making the trial one violative of the principles of a fair trial as contemplated by the law.

As to the petitioner himself, the newspapers consistently referred to him, prior to the third trial, as a "twice convicted rapist," even though Wansley's two rape convictions had been overturned. Carter Glass, the general manager of the Lynchburg papers, has admitted use of the term. (T. 289). Indeed, within two days after Wansley's arrest, the front page of the *Daily Advance* contained a picture of Wansley with an officer identified as one of the arresting officers. The caption, in bold type, is "RAPIST CAUGHT." The news account thereunder refers to Wansley as "a 17 year old Negro youth who was arrested Saturday as the rapist who attacked two women and tried to attack two others." The police were quoted therein as saying he had confessed to raping two women and attacking one.[1] In addition, it was reported that a police officer had "received a tip that a fourth woman had been attacked and information resulting from questioning the woman pointed to young Wansley." The news story goes on to describe what is referred to as his first attack, and in a following paragraph reference is made to "his second assault."

The Supreme Court of Virginia found that the Lynchburg *News*, in December 1962, reported that "a 17 year old Lynchburg Negro, Thomas Carlton Wansley" had been arrested the previous day and charged "with the rape of two white women and the attempted rape of a third." The Lynchburg Chief of Police was quoted as saying that Wansley had admitted that he had attempted to rape a white woman on November 6th, that he had raped a white woman (Kyoko Fleshman) on November 14th, and that he had raped a white woman (Annie Carter) on December 5th. The Court also found that the newspaper reported that, according to the Chief of Police, Wansley had accompanied officers "to the scene of the crimes and pointed out the exact location of each act together with the details." The Lynchburg Commonwealth's Attorney was quoted as expressing to the Police Department the thanks of all Lynchburg citizens for "solving this horrible series of crimes recently committed upon several women of this community." Subsequent articles by both papers referred to his confession of guilt and to his re-enactment of the crimes.

Further, the Lynchburg papers consistently made allegations of alleged Communist ties to Mr. Kunstler and the Wansley defense. One article, for example, which purported to quote Mr. Kunstler on another matter, inserted the following in bold face type:

(Editor's Note: Attorney William M. Kunstler of New York has been linked on numerous occasions with Communist-front organizations and efforts. Kunstler has been in Lynchburg frequently while serving as a defense attorney for twice-convicted Negro rapist Thomas C. Wansley who is now

1. See Part III, *infra*, herein.

awaiting a new trial in Corporation Court after having failed to have his case transferred to federal court.) (*Daily Advance*, 1/4/67)

The information from which the above quoted material was ascertained is contained, according to Glass, the *Daily Advance* manager, in a running file he kept on Kunstler's alleged subversive activities (T. 191).

The Lynchburg News reported, "William M. Kunstler, white New York City lawyer, representing the second Negro attempting to enter the University of Mississippi, is now assisting in the Thomas Wansley case here." The Lynchburg *Daily Advance* made the same report, adding that Kunstler was "special counsel for the New York Gandhi Society of Human Relations." At least one of the papers described Kunstler as having been associated in the defense of Wansley and one who has been active in "the Danville racial turmoil."[2] The news story, so the Supreme Court of Virginia found, went on to state that Kunstler was listed as a member of the National Lawyers' Guild, and further, "The Danville *Register* printed a story last July third noting that the Lawyers' Guild had been cited by the House Committee on Un-American Activities and that it has been thrice listed by Congressional committees as a Communist transmission belt."

The record shows that up to and including the month of his trial in 1967, both newspapers made continual references to Kunstler, describing him as being linked with Communist-front organizations.

The Supreme Court of Virginia, in an opinion by Mr. Justice Gordon, points to an article of March 8, 1967, wherein there was added an Editor's note to an Associated Press report that Kunstler planned to file a suit on behalf of Adam Clayton Powell. The Editor's note

pointed out that Kunstler, who had been linked with "Communist-front organizations and efforts" had frequented Lynchburg as attorney for "twice-convicted Negro rapist Thomas Carlton Wansley."

On the very day the *voir dire* examination of Wansley's third trial began, the Lynchburg *News* ran an article under the headline, "Rape, Robbery Charges Face Wansley at Re-trial." That article referred to Kunstler's links with "Communist-front organizations and efforts" and to his representation of Jack Ruby and Adam Clayton Powell. The article also stated that "Civil rights agitator" Stokeley Carmichael, who had spoken recently at a defense fund rally for Wansley, had advised Negroes to attend Wansley's trial "even if they must miss a day's work." See, Wansley v. Commonwealth of Virginia, 210 Va. 462, 171 S.E.2d 678 (1970).[3]

When a local college student newspaper complained of the highly inflammatory coverage given the Wansley cases, a *News* editorial of April 4, 1967, replied in part:

The editors of The Sun Dial, the weekly newspaper published "by the students of Randolph-Macon Woman's College," should be quite pleased with themselves. They have parroted to perfection the Communist line on the cases of Commonwealth v. Wansley which have been tried in the Corporation Court for the City of Lynchburg.

The "masters of deceit" in the Kremlin undoubtedly are casting admiring glances in the direction of Randolph-Macon. Even those poor souls subject to Communist Party discipline seldom do as good a job of subversion of American institutions.

Articles written in editorial form in The Sun Dial attacked justice, the courts and the judicial system in the South, and claimed that Wansley had received an "unfair trial." Such

---

2. Danville is a Virginia city located south of Lynchburg.

3. Not all of the aforementioned quoted news stories have been located by the

Court in this voluminous file. They were, however, part of the record before the Supreme Court of Virginia.

articles were critical of the local newspapers and radio stations and the "attitude of the people of Lynchburg." This, of course, is a typical Communist line of attempting to turn attention away from the defendant in a criminal case and instead, putting the community, society as a whole, the judicial system and the communications media on trial.

\*　\*　\*　\*　\*　\*

Communist and Communist-front reporters have appeared at many of the court proceedings during the four and one-half years that the Wansley cases have been pending. Communications media have been bombarded with "press releases" from the Southern Conference Educational Fund, which is an identified Communist-front organization. The executive head of this organization is one Carl Braden, an identified hard-core Communist who has made various visits to Lynchburg.

\*　\*　\*　\*　\*　\*

Let us examine several of the series of errors in The Sun Dial article referred to above. The article has Wansley convicted of one rape only. It has that one case appealed twice to the State Supreme Court and claims that both times the case was overturned "because of an unfair trial." The actual facts are that Wansley was convicted of two distinct and separate rapes of different women by different juries. Both rape cases were appealed to the State Supreme Court, once each, and were reversed and new trials were ordered because of technical errors, having no bearing on innocence or guilt. Even the Worker article referred to above admits that the original rape cases were reversed "because of procedural errors."

\*　\*　\*　\*　\*　\*

The Communists have used the big lie propaganda technique throughout the pendency of the Wansley cases. This concept was originated by the Communist theorists, brought to fruition by the National Socialists and the Fascists and used to greatest advantage all over the world by the Russian brand of Communists. The Randolph-Macon editors are dupes of this totalitarian line, no more or less stupid than their counterparts, dwelling in ivory towers all over the world.

While the foregoing was published immediately subsequent to Wansley's trial, it is indicative of the consistently inflammatory nature of the Lynchburg press coverage which provoked national attention as evidenced by reference to the same in the Washington Post, New York Times, Minneapolis Tribune and News Week. Numerous affidavits were submitted by Wansley's counsel in which local Lynchburg residents thought a fair trial impossible there. An affidavit was also submitted by a former News reporter which stated that Glass ordered all references to Kunstler to include references to his alleged Communist affiliations. (T. 145). Glass has denied that he gave such an instruction. Though not probative of the actual effect upon the minds of prospective jurors, the national coverage of the Lynchburg press' policies, coupled with the document heretofore referred to as an open letter to the people of Lynchburg, as well as the affidavits and the available editorials and news stories contained in the file, are all indicative of the pervasiveness of the inflammatory coverage.

B. Effect on Venire.

■ The existence of the above recited inflammatory press coverage would not by itself, *ipso facto,* indicate that a fair trial was precluded. Rather, to make that determination requires scrutiny of the *voir dire* proceedings. See Beck v. Washington, 369 U.S. 541, 557, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

The *voir dire* of Wansley's third trial consumes over 400 pages of testimony. The Court has carefully scrutinized that record and has made findings as summarized in the table following. A word of explanation is in order with respect to the preparation of the table. For each

witness the following matters were considered:

1. "Read papers"—If the witness read either of the two local papers with regularity, the box is checked.

2. "Disposition": C—struck for cause; P—placed on panel, subsequently struck on peremptory; J—trial juror.

3. "Effect of publicity"—This is subdivided into categories roughly as outlined in Irvin v. Dowd, *supra*.

a. "Preconceived notions—inflexible"—the witness has formulated an opinion as to guilt or innocence or as to the character of counsel and is inflexible.

b. "Preconceived notions—flexible"—the venireman has a preconceived notion as to guilt or innocence but is flexible.

c. "Exposed—no notion"—The venireman admits to reading the above recited press coverage, but claims to be unaffected by it.

d. "No exposure"—The venireman claims not to have read or heard anything about the case.

These findings are made necessarily on the basis of the witness' own statements. (See Table—Appendix A)

Of those questioned about reading the Lynchburg dailies, all but one venireman admitted to doing so, and the remaining venireman admitted to being an occasional reader. Of all those questioned, only three stated they knew nothing of the case, and one of those was stricken because of greater credence given to police testimony. Of the 21 persons placed on the jury panel, 18 stated that they had read the above described press coverage but formed no opinion from it; 1 stated he was not sure whether or not he had an opinion; and two stated that though they read the local newspaper, they did not remember said coverage. All of the eventual jurors and single alternate stated they remembered said adverse publicity. Of the thirty who were disqualified for cause, 16 were so disqualified because they had, on the basis of the media coverage, formed an opinion as to the guilt of the petitioner. At least one juror who stated he had formed an opinion from the news accounts, further stated that having so formed an opinion "that it would be difficult to give an unbiased decision." The Court on its own motion excused him with the following comment, "Well, if you have difficulty in doing it, of course, you are not a juror that stands impartial on this case."

The record reflects that the trial judge sequestered the jurors during the trial. The purpose, of course, was to insulate the jurors from outside influences and was obviously within the sound discretion of the Court. See United States v. Holovachka, 314 F.2d 345 (7th Cir. 1963). The difficulty, however, was that in the instant case the outside influences, i. e. the news accounts, had been so pervasive prior thereto that the insulation could not eliminate impressions they may have prior thereto, at least subconsciously, formed. What the ears hear and the eyes see, the mind retains, is a truism. While the sequestering of jurors in cases of great public interest is a commendable procedure, it logically follows that the danger of news accounts influencing a juror may well be less during the trial of a case when he or she has the evidence fresh in mind and can at that time judge the accuracy or inaccuracy of such news accounts, than the inflammatory accounts prior thereto.

*Conclusion of law.*

◼ The Court concludes that the effect of adverse trial publicity was of such nature as to preclude the possibility of an impartial trial.

The Supreme Court has clearly stated that "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, *supra*. The difficulty in applying the principle lies in the interpretation of "indifferent jurors." In *Irvin, supra*, 366 U.S. at 723, 81 S.Ct. at 1642, the Court set forth a *minimum standard*:

To hold that the mere existence of any preconceived notion as to the guilt

or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

See also, Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

■ Those veniremen chosen for the jury panel *on the face of their own statements* appear to meet this standard. Yet this Court in over 22 years of trial experience is well aware of the good intentions of most jurors. It is not unusual to anticipate that certain veniremen would express, in sincere belief, an impartiality when faced with the duty of sitting on a jury, despite conscious or unconscious reservations. It is therefore important to contextualize the application of the standard; there may well be a distinction, for example, between random veniremen who express impartiality in spite of knowledge of a case and a *pattern* of such responses. The Supreme Court itself seemed cognizant of the distinction in *Irvin, supra*:

> Here the build-up of prejudice is clear and convincing. An examination of the then current community pattern of thought as indicated by the popular news media is singularly revealing. For example, petitioner's first motion for a change of venue from Gibson County alleged that the awaited trial of petitioner had become the *cause célèbre* of this small community —so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial.

The reasoning of the above cited paragraph is well applicable herein. It is the responsibility and duty of this Court to independently evaluate the *voir dire* testimony of the jurors. See *Irvin, supra*, 366 U.S. at 723, 81 S.Ct. 1639. A study of the record reveals that the *Wansley* cases were indeed a *cause célèbre* in Lynchburg. In an editorial of April 4, 1967, published in the *News*, a Lynchburg paper, the writer described the case as a *"cause célèbre."* He or she attributes such a result to "the Communists." The notoriety was due in great part to highly inflammatory press coverage and was so pervasive that all but a very few veniremen called had admitted knowledge of the case. In such an atmosphere, the Court finds that as a matter of law it is well nigh impossible for prospective jurors to possess the "indifference" required for an impartial hearing, personal good intentions notwithstanding. The trial court's refusal to grant a change of venue was fatal to Wansley's right to a fair and open trial in which the verdict would be based on the evidence adduced at trial.

It is to be recognized that "impartiality [on the part of a juror] is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." See United States v. Wood, 299 U.S. 123, 145–146, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936).

There is no issue as to the right of the Lynchburg newspapers to appear intemperate or to print what its principals deemed to be appropriate. The consequences arising therefrom are well worth the need for a free and unfettered press, left to its own sense of fairness and discretion. When, however, the consequences affect constitutional rights of another, the courts must, upon appropriate application, act. The totality of the circumstances, however, in examination, convince the Court that the reference to Wansley as a convicted black rapist of

white women, in a community in which the local press' policies described by leading organizations of the community as referred to *supra,* coupled with the reference to Wansley's counsel as a Communist-front attorney, as well as other newspaper references to the matters with which we are here concerned, was to place upon even the most intelligent and dedicated juror a herculean and, in the Court's opinion, an impossible task to maintain the appropriate detachment to the end that the case be decided solely on the evidence.

## II. UNREPRESENTATIVE GRAND JURY

Petitioner contends he was denied due process and equal protection in that he was indicted by an unrepresentative Grand Jury from which members of his social and economic class were deliberately and systematically excluded.

In Hairston v. Cox, 459 F.2d 1382 (4th Cir. 1972), the United States Court of Appeals for the Fourth Circuit stated that it is not necessary for a complainant to show by *direct proof* that Negroes have been systematically excluded from petit or grand jury panels, but rather that circumstantial factors may be shown to adduce that conclusion. Adequate evidence of exclusion may be demonstrated by evidence of "disproportionate representation [which] was recurrent, systematic and relatively uniform in degree." (Citing Witcher v. Peyton, 405 F.2d 725, 728 (4th Cir. 1969)).

In the criminal action of which the petitioner complains, the trial judge was charged by law to select grand jurors. Va.Code Ann. (1950) §§ 19.1–147 et seq. The trial judge stated that he usually selected for the Grand Jury only those within his personal knowledge and that he did not consult with other people in making his selections (T. 209, 300). Other statements by the trial court as to selection included the following:

Mr. Kunstler: Does your Honor use any list from which the selections are made?

The Court: No, usually from knowledge of a person's living in a particular ward, sometimes consult the petty jury list and sometimes consult the city directory, use any available information as to persons. [T. 299]

In respect to the Judge's selection of those who were within his personal knowledge, Witcher v. Peyton, 405 F.2d 725 (4th Cir. 1969) is apropos. In *Witcher* the petitioner, a Negro, attacked a rape conviction on the basis that Negroes had been unlawfully excluded from juries and grand juries. The facts showed that the State judge, also pursuant to Va.Code (1950) § 19.1–147 et seq., chose "people who I think are qualified to serve as grand jurors * * * men who would be good grand jurors above the average in intelligence." The results of this method, so the Court found, were that Negroes despite constituting 25% of the local population, were rarely, if at all, on impaneled grand juries for the then preceding five years. The Court ascribed this result not necessarily to ill intentions of the judge, but to the fact that:

"It is obviously true that white people do not generally have the wide acquaintance among Negroes that they have among other white people. A failure of either the judge or the commissioners fully to acquaint themselves with all those eligible for jury duty can just as effectively result in racial discrimination as would conscious and deliberate invidious selection. Indeed, within the meaning of the Equal Protection Clause, such a failure has been equated with deliberate and purposeful discrimination." See also, *Hairston, supra.*

[The Court in *Witcher* also noted that racial designations made on jury and grand jury lists invited discrimination.]

Because the trial court herein did indicate in the heretofore quoted language that his selection process may have been more random than that described in *Witcher*, the Court is reluctant to find *Witcher* dispositive of the issue *ipso facto.* Accordingly, the Court must turn to additional evidence in an effort to ascertain if, in its opinion, a discrimina-

tory pattern is demonstrated under the rule of *Hairston, supra.*

On March 14, 1967, Wansley moved to quash the indictment on the ground of unrepresentative grand jury. Pursuant to that motion, he filed a statistical analysis of grand jury composition for the five year period 1962–1967,[4] which analysis remains uncontroverted on the record. It states *inter alia* that 20 of 169 total grand jurors, or approximately 12%, were Negro. In 1960 Negroes comprised approximately 23% of Lynchburg's total population of 54,790. Other data reflects extant conditions, *e. g.*, that most Negroes live in the downtown area which accordingly supplied the bulk of Negro grand jurors; that no Negro grand jurors were corporate executives because of the apparently limited number of Negro corporate executives in Lynchburg during the aforementioned period.

The Court finds that the disparity between the Negro proportion of the Lynchburg population and the Negro grand jurors who served was about two to one.[5] In Stephens v. Cox, 449 F.2d 657 (4th Cir. 1971), the United States Court of Appeals for the Fourth Circuit stated that a two to one disparity "will establish a *prima facie* case of racial discrimination, if the disparity is coupled . . . with a showing that the selection procedure provides an 'opportunity for discrimination.'" That the opportunity was here present is established in *Witcher* and *Hairston, supra,* which concern the same statutory scheme for grand jury selection.

■ The United States Supreme Court in a unanimous opinion in the case of Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), dealing with what appeared from the record to be a benign, nonracial consideration in the selection of grand jurors, held that where proof of opportunity for discrimination coupled with a disproportionately low number of Negroes throughout the selection process exists, discrimination is in fact proved. The lack of a conscious design to discriminate is insufficient in and of itself to adequately meet the State's burden of proof where, as here, the result creates a *prima facie* case of systematic exclusion. Where the opportunity exists the Court must be satisfied from the proof adduced that it was not resorted to. See Alexander v. Louisiana, *supra.*

■ In accord with the foregoing, it is apparent that the plaintiff has established a *prima facie* case of discrimination, and the Court must therefore consider whether the State has adequately rebutted or explained said discrimination. Upon pleadings, documents submitted thereto, and oral argument, the State has denied discrimination. The gravamen of defendants' argument is that:

1. The statistical analysis is incomplete.

2. Negroes have been present on grand juries in varying numbers.

3. The grand jury which indicted Wansley was determined in accordance with Virginia law.

4. There is no constitutional right to a jury composed of uneducated people, or people chosen from any end of the economic scale.

5. The grand jury is not required to be a mirror image of the community.

■■ The Court concludes that these reasons do not rebut the *prima facie* showing. Only the first of the arguments raised, that the statistical data

---

4. Wansley was indicted in January 1963. The Court will nevertheless accept this study as probative of the grand jury composition at the time of the indictment.

5. No figures are available on the Negro proportion of adults eligible to serve. The Court will assume that said proportion is nearly similar to the proportion of Negro residents of all ages. This assumption would be inaccurate if the number of Negro children under age 21 per family were proportionately greater than the number of white children. Nevertheless, the Court concludes that any disparity therefor, would not make a material difference in the above quoted statistics.

was incomplete, raises a relevant issue. This argument, however, is conclusory. No proof has been submitted which would lead the Court to a view that the statistics available are inappropriate for the purposes required, and the Court accordingly will treat the statistics as they appear on their face in the manner described *supra*. The other assigned arguments are conclusory as well, and without relevance to the issue raised, regardless *arguendo* of the assumed accuracy of at least some of the assertions.

Accordingly, the Court, on this record, concludes that Wansley was indicted by a grand jury which was not representative and a product of discrimination.

### III. TESTIMONY OF PROBATION OFFICER

Wansley's third alleged ground for relief is that the conviction was illegal by virtue of the admission testified to by Probation Officer Read. The facts with regard to this issue are uncontroverted. After his arrest, Wansley was interrogated for five hours without counsel or the presence of a parent. Thereafter Wansley's mother, responding to a telephone call by the authorities, arrived at the jail to see her son. Probation Officer Read met her and informed her that Wansley was accused of several crimes including the rape and robbery of Miss Carter, and the rape of Kyoko Fleshman. When Read and Wansley's mother reached the cell, Read testified, "I told Thomas that I had his mother here and that I had told her why he was in." (T. 996). Thereupon Mrs. Wansley asked, "Buddy did you do it?" Wansley answered, "Yes." (Wansley contends that his answer was made with respect to Mrs. Fleshman with whom he admits having what he contends to be consensual sexual relations.)

Upon trial, Read testified over objection to the above recited exchange between Wansley and his mother. The trial court allowed introduction of the evidence on the basis that it was a "declaration against interest" and an "admission" and not a confession. Apparently in a sincere effort to avoid the

dangers of a mistrial which might arise from mentioning the Fleshman charge, Read did not contextualize said exchange in terms of the Fleshman charge. Wansley's counsel, however, developed all these matters upon extensive cross-examination.

This incident at the trial gives rise to two contentions by Wansley: first, the introduction of the admission was a violation of his constitutional rights; second, that Read's presentation upon trial was perjured with a view to altering the meaning of the heretofore recited exchange.

Admissibility of evidence in state trial court is not cognizable on federal habeas corpus "unless fundamental fairness or [infringement of] specific constitutional protections" is in issue. Grundler v. North Carolina, 283 F.2d 798 (4th Cir. 1960), cert. denied, 362 U.S. 917, 80 S.Ct. 670, 4 L.Ed.2d 738 (1960). Challenges based on the *Miranda* standard as to the admissibility of statements by the plaintiff in front of Read are precluded by the rule of Jenkins v. Delaware, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969), which held that the *Miranda* rule does not apply to a retrial begun after the date of the *Miranda* decision where the original trial was commenced prior to that date.

Wansley's challenge does, however, raise another issue of "fundamental fairness" within the *Grundler* rule, *supra*, to-wit: whether the testimony of Read violated his role as a juvenile court officer, a *parens patriae*.

That the Virginia Juvenile Court, and the probation department related thereto, was established to protect the juvenile is indicated by Va.Code § 16.1–203, which reads *inter alia* as follows:

§ 16.1–203. Department to develop social services for courts; division of supervision of probation and detention; appointment of probation officers; advisory council.—It shall be a function of the Department to develop probation, detention and other social services for juvenile and domestic relations courts so that all children com-

ing within the jurisdiction of such courts throughout the State *shall receive the fullest protection of the court.* To this end the Director is empowered to establish a division of supervision of probation and detention in his Department, and to appoint a head thereof, who shall have training and experience in the fields of social case work and social services with juvenile and domestic relations courts . . . (Emphasis added).

■ Introduction at trial of statements made before a Juvenile Court officer while an accused was still under Juvenile Court jurisdiction is a gross distortion of the *parens patriae* concept. The officer is bound by State law to deal with his juvenile charge in a manner which is most conducive to his rendering to the juvenile assistance leading to the receipt by the child of the fullest protection of the Court. The probation officer's duty is to protect the juvenile; permitting him to testify against his charge is a breach of trust.

The Court of Appeals for the District of Columbia has adopted this reasoning in Harling v. United States, 111 U.S. App.D.C. 174, 295 F.2d 161 (1961), wherein it was held that:

> Aside from the requirements of expressly applicable statutes, the principles of "fundamental fairness" govern in fashioning procedures and remedies to serve the best interests of the child. It would offend these principles to allow admissions made by the child in the non-criminal and non-punitive setting of juvenile proceedings to be used later for the purpose of securing his criminal conviction and punishment. Such a practice would be tantamount to a breach of faith with the child, since he cannot be charged with knowledge of either his privilege against self-incrimination or the Juvenile Court's power to waive its jurisdiction and subject him to criminal penalties.

> Moreover, if admissions obtained in juvenile proceedings *before* waiver of jurisdiction may be introduced in an adult proceeding *after* waiver, the juvenile proceedings are made to serve as an adjunct to and part of the adult criminal process. This would destroy the Juvenile Court's *parens patriae* relation to the child and would violate the non-criminal philosophy which underlies the Juvenile Court Act. *Harling, supra,* 295 F.2d at 163 (f. n. omitted).

This rule has been extended by the D.C. Court of Appeals to bar introduction of a "confession or admission officially obtained from [an accused] when he was a juvenile detained under the auspices of the Juvenile Court, where the latter court subsequently waived its jurisdiction and transferred the accused for trial to the District Court [as an adult offender]." Edwards v. United States, 117 U.S.App.D.C. 383, 330 F.2d 849 (1964); see also, Harrison v. United States, 123 U.S.App.D.C. 230, 359 F.2d 214 (1965).

■ In the instant case Read was an officer of the Juvenile Court. He was in the position of a parent over a juvenile legally in his charge. It matters not whether Wansley's admission was made to him or before him. His presence at the time was by virtue of his position. Read's testimony with regard thereto after juvenile jurisdiction was waived is, in this Court's view, a violation of fundamental fairness and a breach of the trust established in the Virginia Juvenile Court system.

Introduction of said testimony was violative of Wansley's rights. Because of the potentially inculpatory nature of the admission, the Court finds that its introduction into evidence was not harmless error. Accordingly, this deprivation being cognizable under *Grundler, supra,* was fatal to the conviction complained of.

## IV. ADDITIONAL GROUNDS ASSERTED

Wansley has asserted several additional grounds for relief which the Court deems to be without merit. To the end, however, that all presented issues be

addressed, the following hopefully adequately expresses the Court's reasoning as to each contention:

■ a. Petitioner contends that his conviction was illegal by virtue of the prosecution's alleged failure to comply with a Court Order to produce a copy of an alleged confession prior to trial. There is no showing that plaintiff's rights in this regard were prejudiced, hence no issue of constitutional magnitude arises.

b. Wansley alleges that the prosecution deliberately suppressed evidence and allowed Read to perjure himself. In view of the Court's disposition of Read's testimony, *ante*, the Court need not further consider these allegations with regard thereto.

■ c. Wansley attacks his conviction on the basis of the unavailability of Grand Jury transcripts to the defense (none were made) and the refusal of the Court to allow examination of Grand Jurors. The petitioner showed no need, in the discretion of the trial court, to examine grand jurors. Absent a showing of need—even in a case wherein no minutes were made—denial of permission to examine grand jurors is a proper exercise of discretion. United States v. Chase, 372 F.2d 453 (4th Cir. 1967).

■ d. Wansley claims that he was denied due process and equal protection by not having transcripts of the certification hearing (none were made as no statutory authority existed for same). The general rule as to transcripts of *preliminary hearings* is set forth in Gardner v. United States, 132 U.S.App.D.C. 331, 407 F.2d 1266, 1267 (1969):

> Appellants had a right to a written transcript [of a *preliminary hearing*] upon request . . . . Timely objection to denial of this right requires reversal of a conviction if accused was prejudiced by the denial . . . (Emphasis supplied).

The petitioner has failed to show how unavailability of the transcript in question has prejudiced his rights. More-over, a distinction might be made between certification hearings (which determine the accused's status as adult or juvenile for purposes of criminal process) and preliminary hearings (which are integrally part of the criminal conviction process.) While the Court has found no case directly on point, it appears appropriate to follow the guidance of *Gardner, supra.* The result seems proper when viewed in the informal context of juvenile proceedings.

■ e. Wansley alleges as well that his constitutional rights were violated by the failure of the Juvenile Court Judge to state the reasons for his certification. Case law does support the proposition that in juvenile waiver of jurisdiction hearings, due process must be afforded the defendant. One requirement of due process is a statement of reasons by the certifying judge for his decision. Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1965). Defendant contends and the Court agrees that the reasons for Judge Wingo's determination and the factors considered were clearly stated. Wansley's challenge as to the procedures of the certification hearing are without merit.

f. Petitioner Wansley challenges his conviction on the basis that the Virginia Rape Statute, in failing to give appropriate standards, denied petitioner due process of law. The challenge herein is a bald accusation unsupported by case authority. The Court finds it both unnecessary and inappropriate to consider this issue.

g. Petitioner's final contention challenges his conviction on the basis of the fact that statements made in the absence of counsel while under jurisdiction of the Juvenile Court were used as evidence in the trial court. The Court has heretofore dealt with this issue in reference to the statements made in the presence of the Juvenile Officer and since it must to some extent, at least, do so with regard to petitioner's declaratory judgment claims, *infra*, same should suffice.

*Relief Sought Pursuant to 42 U.S.C. § 1983*

Plaintiff seeks a judgment declaring the following alleged practices in the Commonwealth of Virginia unconstitutional:

a. The use in criminal proceedings of confessions and/or any other incriminating statements obtained from children, without counsel in prior Juvenile Court proceedings. In view of Supreme Court decisions in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); and In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1966), the Court concludes that alleged constitutional violations of the type herein complained of are adequately curtailed. Relief sought in this regard is therefore unnecessary and will not be granted.

b. The failure or refusal of Juvenile Court judges to set forth in their certification orders their reasons for certifying a minor to a court of record to be tried as an adult and failure to transcribe certification proceedings or permit Juvenile Court Judges to testify to same. The Supreme Court of the United States in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), held that juvenile waiver of jurisdiction hearings require basic elements of procedural due process, including a hearing, effective assistance of counsel and a statement of reasons. These standards, the Court finds, were met in the action giving rise to the instant cause, and the procedures under Va.Code (1950) § 16.1–176(a)(b) have been considered by the United States Court of Appeals for the Fourth Circuit as generally providing appropriate constitutional safeguards. See Redmon v. Peyton, 420 F.2d 822 (4th Cir. 1969). These conclusions similarly apply to other practices complained of in Count I(c) of the instant complaint.

c. The failure of Virginia to either transcribe Grand Jury proceedings or permit grand jurors to testify as to proceedings before the Grand Jury. Virginia courts have long regarded grand jury proceedings as highly secret, with limited or no access allowed to defendants to minutes or oral testimony of Grand Jury proceedings. Wadley v. Commonwealth, 98 Va. 803, 35 S.E. 452 (1900). The United States Court of Appeals for the Fourth Circuit has upheld the principle surrounding the veil of secrecy which protects the proceedings of such a body. United States v. Chase, 372 F.2d 453 (4th Cir. 1967). See also, Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959). Although concededly in rare cases access to written eyewitness accounts of grand jury proceedings may be proper, this Court is bound by the general rule as heretofore indicated.

For the reasons assigned, the writ will issue. The relief sought under Title 42 U.S.C. § 1983 will be denied.

## ORDER GRANTING WRIT OF HABEAS CORPUS, DENYING DECLARATORY JUDGMENT RELIEF, and ORDERING RETURN OF STATE COURT RECORDS

For the reasons stated in the memorandum of the Court this day filed, it is adjudged and ordered that:

1. Defendants Miller, Wingo and Read, be, and they are hereby, dismissed as defendants herein.

2. The convictions of the petitioner in the Corporation Court of the City of Lynchburg, Virginia, on March 18, 1967, on charges of rape and robbery respectively, be, and each is hereby, declared void.

3. The respondent, Slayton, shall release the petitioner, Wansley, from further custody pursuant to said convictions.

4. The effect of this order is stayed sixty days to permit the Commonwealth of Virginia to retry the petitioner if it be so advised.

5. Petitioner's prayer for relief contained in Count I of the complaint be, and the same is hereby, denied.

## APPENDIX "A"

| NAME | READ PAPER | DISPO-SITION | PRECONCEIVED NOTION-INFLEX. | | PRECONCEIVED NOTION-FLEX. | | EXPOSED NO NOTION | NO EXPOSURE |
|---|---|---|---|---|---|---|---|---|
| | | | ANTI | PRO | ANTI | PRO | | |
| Abrams | - | C | | | | $X^1$ | | |
| Badgett | X | P | | | | | X | |
| Bennington | X | C | | | X | | | |
| Billingsly | X | $C^2$ | | | | | | |
| Booth | - | $C^3$ | | | | | | |
| Burnette | X | J | | | | | X | |
| Dillard | Occa. | P | | | | | | X |
| Figg | X | $C^2$ | | | X | | | |
| Fleshman | X | J | | | | | X | |
| Green | - | $C^4$ | | | | | | |
| Hamlett | X | P | | | | | X | |
| Kenefake | X | C | | | X | | | |
| Kidd | X | P | | | | | X | |
| Lee | X | C | | | | | $X^1$ | |
| McGuire | X | $C^2$ | | | X | | | |
| Thompson | X | J | | | | | X | |
| Scott | X | P | | | | | X | |
| Woody | X | $C^2$ | | | X | | | |
| Langhorne | X | $C^5$ | | | X (Unsure) | | | |
| Burton | X | J | | | | | X | |
| Pleasants | X | J | | | | | X | |
| Wood | X | C | | | X | | | |
| Craven | X | $C^2$ | | | | | | X |
| Viar | X | C | | | X | | | |
| Vaughan | X | J | | | | | X | |
| Ferrell | X | J | | | | | X | |
| Ballowe | X | C | | | X | | | |
| Flowers | X | C | | | X | | | |
| Parsonage | X | P | | | X (Unsure) | | X | |
| Burch | X | $C^6$ | | | | | X | |
| Ashwell | X | P | | | | | X | |
| Burton | X | J | | | | | X | |
| Candler | X | $C^2$ | | | | | X | |
| Carey | X | P | | | | | X | X |
| Fielder | - | $C^7$ | | | | | | |
| Walker | - | $C^7$ | | | | | | |
| Capito | - | $C^8$ | | | | | | |
| Hamer | X | C | | X | | | | |
| Dowdy | X | C | | X | | | | |
| Creecy | - | $C^9$ | | | | | | |
| Glass | X | C | | | X | | | |
| Mullen | X | C | | | X | | | |
| Pursley | X | C | | | X | | | |
| Vest | X | J | | | | | X | |
| Woodall | - | $C^9$ | | | | | | |
| Burnett | X | J | | | | | X | |
| Hooks | X | C | | | X | | | |
| Brown | X | C | | | X | | | |
| McFall | X | J | | | | | X | |
| Edwards | X | J | | | | | X | |
| Shakeford | X | Alt. J. | | | | | X | |

1. Contributed to defense fund.
2. Per trial court—excused for cause because would place greater credence on police testimony.
3. Bad Hearing.
4. Over 70 yrs. of age.
5. Would accord weight to defendant's failure to testify.
6. Knew witness.
7. Opposed to capital punishment.
8. Knew prosecutrix.
9. Inability to understand court process.
(NOTE: Two additional veniremen were excused under the Court's initial questioning as being opposed to capital punishment.)