Dan WITCHER, Appellant,

v.

C. C. PEYTON, Superintendent of the Virginia State Penitentiary, Appellee.

No. 12025.

United States Court of Appeals
Fourth Circuit.

Argued March 8, 1968.

Decided Jan. 10, 1969.

Ruth L. Harvey, Danville, Va., and S. W. Tucker, Richmond, Va. (Hill, Tucker & Marsh, Richmond, Va., J. L. Williams, Danville, Va., Jack Greenberg and James M. Nabrit, III, New York City, on the brief), for appellant.

Overton P. Pollard, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia and Reno S. Harp, III, Asst. Atty. Gen. of Virginia, on the brief), for appellee.

Before BRYAN and CRAVEN, Circuit Judges, and MacKENZIE, District Judge.

CRAVEN, Circuit Judge:

In January 1963 Dan Witcher was convicted by a jury in the Circuit Court of Pittsylvania County, Virginia, on an indictment charging attempted rape and was sentenced to a term of 35 years and one day, the sentence also having been imposed by the jury.[1] After unsuccessfully applying for habeas corpus relief in the state courts and in the federal district court, Witcher sought relief in this court, where, in Witcher v. Peyton, 382 F.2d 707 (4th Cir. 1967), we held that his pleadings stated a prima facie case of unlawful exclusion of members of his race from grand and petit jury service. We reversed the dismissal of his petition and remanded to the district court with instructions to afford petitioner opportunity to prove his claim. Upon a hearing, relief was again denied, the district court being of the opinion that "no deliberate and purposeful discrimination has been established in the selection of the jury at petitioner's trial."[2] The case is again before us on an appeal from this decision.

The uncontested facts are that of a total adult population in Pittsylvania County of 31,439, 8,604, or roughly one-quarter, are non-white. Of the 37 grand juries impaneled from January 1957 through September 1962, at least ten were all white, and none of the other 27 included more than one Negro. The names of the Negroes chosen on each of the grand jury lists compiled by the county circuit judge and on each of the writs of venire facias issued by him were without exception followed by the designation "Col." The order summoning the grand jury which indicted the defendant named seven men, one of whom was designated "David Logan (Col.) (Dan River District)."

The petit jury lists, compiled by five jury commissioners appointed by the circuit judge, also without exception contained the designation "Col." when Negroes were chosen. The 1962–63 jury list, from which the defendant's jurors were selected, consisted of a total of 400 persons of which 31, or roughly eight percent, were Negroes.[3] In the course of the six terms of court held during that year, no more than three Negroes were ever drawn from the pool for any one writ of venire facias, and all were designated as Negro on the writ which summoned them. Of the 35 persons drawn for the defendant's trial only three were Negro and they were also labeled "Col." None of the three named in the writ served on the jury which convicted and sentenced the defendant.

The Pittsylvania County Circuit Judge testified that in compiling the grand jury pool and in selecting the grand jurors to be summoned no racial discrimination was practiced, but, rather, in choosing he was motivated by a desire to find "people who I think are qualified to serve as grand jurors * * * men who would be good grand jurors above the average in intelligence." The judge testified that it was his practice to select potential grand jurors from among persons he was familiar with: "I don't want

---

1. In Virginia, the power to impose sentences in all misdemeanor and felony cases resides in the jury. Va.Code Ann. §§ 18.1–9, 19.1–291, 19.1–292 (1960).

2. The district judge neither found facts nor made separate conclusions of law. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The record is not entirely clear but apparently he simply adopted, at least by implication, the findings and conclusions of the state court, which in turn, rest partly upon stipulations.

3. Statistical analysis suggests that had a random method of selection been employed in compiling the 1962–63 petit jury list, the mathematical probability of this list including only eight percent non-white is .0000098. Similarly, had a random method been used in the selection of grand juries in Pittsylvania County, the probability of a single grand jury including only one non-white is .28. Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv.L.Rev. 338 (1966). Cf. Whitus v. Georgia, 385 U.S. 545, 552 n. 2, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).

to put somebody on there just at random." Jury Commissioners W. H. Wilson, III, Gordon N. Cocke, George T. Farthing, M. L. Hardy and Herbert J. Hutcherson, in substance, testified that in compiling the petit jury lists they did not practice racial discrimination but were guided by a desire to find the best qualified people. They also testified that the selections were made primarily from among individuals known to them personally. W. H. Wilson, III, testified that he did not select at random "because you get those who are not qualified to serve on jury duty." Wilson also testified that "you list the people according to color, in order not to discriminate against that (Negro) race, so that is what I did."

■ In performing their duties, the jury commissioners followed the instructions of the state judge. His approach became theirs, as indicated in the testimony recited hereinabove. Such a highly subjective selective approach is at war with the idea that trial by jury in the American States means trial by a jury composed of a fair "cross-section of the community." [4] See, e. g., Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Labat v. Bennett, 365 F.2d 698, 719–720 (5th Cir. 1966); Allen v. State, 110 Ga.App. 56, 62, 137 S.E.2d 711, 715 (1964); State v. Koritz, 227 N.C. 552, 43 S.E.2d 77, 81 (1947); see also, Comment, Jury Challenges, Capital Punishment, and Labat v. Bennett; A Reconciliation, 1968 Duke L.J. 283. Mr. Justice Murphy stated what has become the "cross-section principle" in Fay v. New York, 332 U.S. 261, 299–300, 67 S.Ct. 1613, 1633, 91 L.Ed. 2043 (1947) (Murphy, J., dissenting): "[T]here is a constitutional right to a jury drawn from a group which represents a cross-section of the community. And a cross-section of the community includes persons with varying degrees of training and intelligence and with varying economic and social positions. Under our Constitution, the jury is not to be made the representative of the most intelligent, the most wealthy or the most successful, nor of the least intelligent, the least wealthy, or the least successful. It is a democratic institution, representative of all qualified classes of people."

Although innocuous on its face, the purpose of both judge and jury commissioners to include only "the best qualified people" and their disinclination to put persons on at random meant inevitably that the venires would be heavily weighted in favor of white people and against the inclusion of qualified Negroes. It should not surprise anyone that an all-white jury commission guided by a white judge would be unlikely to find as high a proportion of the Negro community to be "best qualified" as found among white people. It is a simple truth of human nature that we usually find the "best" people in our own image, including, unfortunately, our own pigmentation. But the danger is not simply subjective. As a practical matter, in a society that is still largely segregated, at least socially, it is obviously true that white people do not generally have the wide acquaintance among Negroes that they have among other white people. A failure of either the judge or the commissioners fully to acquaint themselves with all those eligible for jury duty can just as effectively result in racial discrimination as would conscious and deliberate invidious selection. Indeed, within the meaning of the Equal Protection Clause, such a failure has been equated with deliberate and purposeful discrimination. Hill v. Tex-

4. It is interesting to note that the Congress of the United States has in the 1968 Jury Selection and Service Act abandoned the "key man" system in favor of random selection. The so-called key man system was found wanting by the Congress because of its inherent tendency to call only the "best" people for jury service. Although not of constitutional dimension, the action of the Congress undergirds the notion that the individual does not receive the full protection to which he is entitled in a trial by jury unless that jury consists of a fair cross-section of the community. 28 U.S.C. § 1861, Pub.L. No. 90–274.

as, 316 U.S. 400, 404, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942).

Achievement of the stated purpose of the judge and the jury commissioners to get only the "best qualified people" was not aided by the existence of any objective standard that might have been readily applied. The only direction given by the legislature to the judge in that regard is that he select from the citizens of each county "persons 21 years of age and upwards, of honesty, intelligence and good demeanor and suitable in all respects to serve as grand jurors * * *." These are qualities hard to judge. The standards applied by the jury commissioners were, according to the oath subscribed by them, no more definite: "We will select none but persons whom we believe to be of good repute for intelligence and honesty." Standards such as these afford but little guidance to the conscientious judge and jury commissioner. It is not unnatural that each may be left with the feeling that he has discharged his duty when he has subjectively selected the "best folks" known to him.

■ Selection of jurors "must always accord with the fact that the proper functioning of the jury system, and, indeed, our democracy itself, requires that the jury be a 'body truly representative of the community,' and not the organ of any special group or class. If that requirement is observed, the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may one by one lead to the irretrieveable impairment of substantial liberties." Glasser v. United States, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680 (1942).

■■ We do not reach and need not now decide whether in a given fact situation such a "key man" system of jury selection may itself be so foreign to the basic idea of trial by jury as to be unconstitutional. See, Comment, Jury Challenges, Capital Punishment, and Labat v. Bennett: A Reconciliation, 1968 Duke L.J. 283, 299–303. It is enough to hold presently that the protestations of both judge and jury commissioners that they did not intentionally and purposefully discriminate is not the end of the matter. It is not necessary to a successful attack upon a jury selection procedure that petitioner obtain an admission from the judge and jury commissioners that they have discriminated, Swain v. Alabama, 380 U.S. 202, 227, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

This case presents both of the practices condemned as constituting unlawful exclusion from jury service in Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Substantially disproportionate representation of the defendant's race existed on both the grand jury which indicted him and on the venire from which his trial jury was selected. Disproportionate representation was recurrent, systematic and relatively uniform in degree. The limitation of the number of Negroes permitted to serve on the grand jury to one meant that a true bill could always be returned without the affirmative vote of a Negro.[5] Similarly, Negro representation on the petit jury venire was never greater than that which could be removed by peremp-

5. "A grand jury * * * shall consist of not less than five nor more than seven persons." Va.Code Ann. § 19.1–150 (1960). "At least four of a * * * grand jury must concur in finding or making an indictment or presentment." Va.Code Ann. § 19.1–157.

tory challenge.[6] In the selection of both the grand jury and the petit jury venire, "the opportunity for discrimination was present." Whitus v. Georgia, 385 U.S. 545, 552, 87 S.Ct. 643, 647, 17 L.Ed. 2d 599 (1967). In both instances the persons actually summoned were chosen from records maintained on a segregated basis—where Negroes were included, the designation "Col." appeared on the grand jury lists and on the lists from which the petit jury veniremen were summoned. Similarly in Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953), the names of prospective Negro jurors were printed on yellow tickets and placed in the jury box, while the names of white persons were printed on white tickets. The Court stated that: "Even if the white and yellow tickets were drawn from the jury box without discrimination, opportunity was available to resort to it at other stages in the selection process." Id. at 562, 73 S.Ct. at 893. And it matters not that no direct evidence of purposeful discrimination in jury selection was brought forth by the defendant —his proof established a prima facie case of racial limitation and thus it became incumbent upon the state to demonstrate that the limitation was caused by a practice not forbidden by the equal protection clause of the fourteenth amendment. Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22 (1967). "Racial limitation no less than racial exclusion in the formation of juries is an evil condemned by the equal protection clause." Akins v. Texas, 325 U.S. 398, 407, 65 S.Ct. 1276, 1281, 89 L.Ed. 1692 (1945) (Murphy, J., dissenting); Goins v. Allgood, 391 F.2d 692 (5th Cir. 1968).

We hold that the denials of intentional discrimination by the officials responsible for jury selection in Pittsylvania County fail to rebut the defendant's prima facie case. Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22 (1967); Bostick v. South Carolina, 386 U.S. 479, 87 S.Ct. 1088, 18 L.Ed.2d 223 (1967); Whitus v. Georgia, supra. What was said in Whitus v. Georgia, supra, 385 U.S. at 552, 87 S.Ct. at 647, is applicable: "The State offered no explanation for the disparity between the percentage of Negroes on the tax digest and those on the venires, although the digest must have included the names of large numbers of 'upright and intelligent' Negroes as the statutory qualification required." That the venires were selected from the general population rather than tax digests is a difference of no consequence.

"In the selection of juries recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." 31 Am.Jur., Jury § 93, at 84–85.

This does not mean that the State may not in the future establish that any such disparity is *not* the result of discrimination. It could, if true, show that the divergence in number by race of the veniremen is due to the difference in number, within the county, of persons of each race who are *qualified* to serve as jurors —that the ratio of the two races in the total county population is not indicative of the ratio there of *qualified* white and Negro persons. The later adoption of a comprehensive method of gathering and drawing of the names of prospective grand and petit jurors would also be relevant proof.

---

6. "In every case of a felony there shall be selected from the persons summoned, as aforesaid, a panel of twenty persons, free from exception, from which panel the Commonwealth may strike four and the accused four, and the remaining twelve shall constitute the jury for the trial of the accused." Va.Code Ann. § 19.1–207 (1960).

At present the sources of the names of persons eligible for jury service are too limited to provide a jury pool fairly commensurate and representative of the number of each race in the county qualified to act as jurors. This is the sole point on which our decision rests. The explanation of the state judge and the five county jury commissioners must be considered objectively, that is, without imputation of any personal intent to discriminate but judged exclusively on the methods they employed and the actual results. The explanation does not suffice on the facts of this case to meet the state's burden of showing that, even unintentionally, unconstitutional discrimination was not practiced. Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967).

The conclusion we now reach is limited to the facts in this case in this county. It is not intended as a declaration of the invalidity of the composition of juries elsewhere or in other circumstances.

The writ of habeas corpus sought by the petitioner should be granted by the district court and his conviction set aside. Nevertheless its order should not require the petitioner to be released from the custody of the respondent, unless the state fails or declines to reindict him within 90 days from the date of receipt by the respondent of the order of the district court, or fails or declines thereafter to retry him with reasonable promptness.

MacKENZIE, District Judge (dissenting):

I am unable to agree that Witcher's allegations in support of his habeas corpus writ have been proved.

Two claims are made by petitioner.

First, that *prima facie* evidence of discrimination was to be found in the percentile disparity in the ratio of Negro jurors to White jurors when measured against the total White to Negro population in Pittsylvania County, Virginia, in 1963.

Second, that a *prima facie* case of discrimination was made manifest by the indication "COL" opposite the names of Negroes chosen for jury service. These claims are asserted against both the State grand jury and petit jury, which functioned in the indictment and conviction of Petitioner Witcher for attempted rape and for which he was sentenced to thirty-five years.

The very sketchy evidence would indicate that 25% of the total population of Pittsylvania County, Virginia, was Negro in 1963, but the Negro membership on the grand jury that indicted Witcher was only 15% (one on a jury of seven). On the petit jury venire of 33 at Witcher's criminal trial for attempted rape, 8½% were Negroes (three). It is argued that the disparity between the number of Negroes serving on the suspect juries when reflected against the total Negro population of the County makes out a prima facie case of discrimination in the selection of these juries. I do not agree that this is true.

In Virginia, by statutes not here attacked as invalid, qualifications and exemptions for service on grand and petit juries have been established. (Code of Virginia of 1950, Section 8–174 et seq.; 19.1–148; 19.1–150). Percentages, by race, of those serving, therefore, to be valid as even prima facie evidence, must be measured against and relate to the number qualifying for jury service under the valid statutes and not against the total population. The evidence as to the number of *qualified* jurors, White or Negro in Pittsylvania County, has not been presented to this Court.

What is the number of the White or Negro population in the County who were over 21 and under 70 years of age? What is the White and Negro female population who can only serve as jurors if they agree? How many have been residents of the State of Virginia for one year and of Pittsylvania County for six months? How many, White or Negro, meet the minimum standard of competence (which certainly relates, at

least, to literacy), as required by Statute? How many were exempt under the 30 or more exemptions set forth in the Statute?

For example, counsel for petitioner, in oral argument, asserts that the *average* Negro adult in Pittsylvania County in 1963 had only a fourth grade education. Assuming this alarming and disagreeable *average* to be true, it follows that a considerable portion of the Negro population had *less* than a fourth grade education and perforce, no education at all. Education, as such, is not a requisite for jury service but the Virginia Statutes on juror qualifications (8–174, 175) must, in the very minimum, be construed to require literacy. This statistic, which may indict the school system, but not the jury system, serves here to further limit the group from which a qualified jury may be chosen.

The proper inquiry to raise a prima facie case, in my judgment, is to reflect the number of Negroes chosen for jury service against the number of Negroes qualified and eligible for jury service and not the total number of Negro inhabitants of the County. This question is not answered by the evidence on hand and the percentile on a pure population approach fails, even as a prima facie matter, because the statutory qualifications—not attacked—rule out total population as a responsive arithmetical item.

And I find no credible authority anywhere, statutory or otherwise, to support the petitioner's contention that the grand jury should be so composed as to make necessary the affirmative vote of at least one Negro to return an indictment. The Virginia Statute (19.1–157) requires four members of a grand jury to agree. To meet the petitioner's requisite of at least one affirmative Negro vote on the grand jury to indict Witcher, four members of the seven man grand jury which indicted him would have had to be of the Negro race. Such a jury would be 55% Negro.

Likewise, the argument that the petit jury panel did not have such a proportion of Negroes that they could not all be eliminated by peremptory challenges finds no constitutional support. In 1963 the normal criminal venire in a Virginia County was twenty and the number of peremptory challenges was eight. Nowhere do I find authority that the panel should have included nine Negroes.

In 1963 in Pittsylvania County, as in many other Virginia communities, the practice persisted in designating Negroes on the jury rolls as "COL".

In the instant case the grand jury was chosen by Judge Langhorne Jones, as the Statute (Code of Virginia of 1950, 19.1–148) required, in his judgment, "suitable in all respects". Since the judge himself assembled the list of names from which the grand jury was chosen and since he chose the final composition thereof, the fact that the designation "COL" appeared by the name of David Logan, fails to raise any prima facie presumption of discrimination that I can perceive. It could hardly be argued that Judge Jones was trying to influence himself. Judge Jones testified that no discrimination was intended and that, to the contrary, the designation was employed to indicate that discrimination was not practiced in his circuit and that persons of both races were on the grand jury list and were selected for service.

So, too, the names of Negroes on the master jury roll were designated "COL" and on the venire list prepared after the drawing were designated "COL". But the use of "COL" in the peculiar facts of this case do not raise any presumption of discrimination. Unlike Bostick v. South Carolina, 386 U.S. 479, 87 S.Ct. 1088, 18 L.Ed.2d 223 (1967); 247 S.C. 22, 145 S.E.2d 439, and Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), the names placed on the jury roll by the Commissioners in Pittsylvania County, Virginia, were not taken from constitutionally condemned segregated list—(in *Bostick* they were taken from "registered male elector lists", which severely limited Negro listings thereon and from racially seg-

regated registration lists; in *Whitus*, the jury list, by statute, was taken from a racially segregated "tax digest list"). In the instant case, however, the selection was not from an illegal or tainted list, and the designation "COL" was added by the Commissioners, from their own knowledge of the persons involved, in an abundance of caution to affirmatively show that they had followed Judge Jones' admonition that discrimination was not to be practiced. They added the designation to indicate that Negro names were indeed on the roll. The evidence further is that every name taken from the locked jury box was immediately listed on the intended venire list unless to the knowledge of the Clerk, the selectee had died. Even if the designation "COL" might raise a presumption under some circumstances, such presumption is overcome in this case under the explanations made. Indeed, Public Law 90–274, known as "Jury Selection and Service Act of 1968", § 1869(h) suggests that the jury qualification form, to be used in conjunction with this federally promulgated legislation, should request, but not require, *the race* \* \* \* of a potential juror. This information is sought for the particular reason of showing the "at random" jury is, in fact, non-discriminatory and to provide the statistics to prove that point. Thus where race information or "COL" is not considered discriminatory under the jury procedures in force in courts of the United States, it should not be condemned in a state court jury procedure where, as here, the same reasonable explanation of its value is at hand.

This case is not like the first case of Whitus v. Balkcom, 370 U.S. 728, 82 S.Ct. 1575, 8 L.Ed.2d 803, which, on remand, found 45% of the population of Mitchell County was Negro, 42% of the males over 21 were Negro, and *no* Negroes had ever served on the grand or petit juries. This case is not the second Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), in which the attack is against the Georgia statute requiring selection of the grand and petit jury from a tax digest list of 1964, which the federal courts had already condemned for such purpose as being a racially segregated list.

This case is not like Bostick v. South Carolina, 386 U.S. 479, 87 S.Ct. 1088, 18 L.Ed.2d 223 (1967), 247 S.C. 22, 145 S.E.2d 439, where the jury lists were drawn from racially segregated registration lists.

Nor is it Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942), where for at least sixteen years before the defendant was indicted no Negro had ever been called to serve on a Dallas County, Texas grand jury.

In short, the percentage figures presented to show the ratio of Negroes listed for jury service have been worked against the total population of Pittsylvania County, without taking into account the many qualifications for jury service demanded by a valid State Statute not here attacked, and which statute materially limits the citizenry, White or Negro, eligible to serve as jurors. Such percentages, therefore, are of no prima facie value. Moreover, the State has met its burden of proof in the uncontradicted testimony of Judge Jones and the Commissioners that the lists were prepared according to law, from proper sources, Negroes were listed thereon, no discrimination was intended or practiced and the designation "COL" was made in an effort to objectively show no discrimination. Negroes were included on the panel of the grand jury and petit jury involved with Witcher. He was convicted of a heinous crime, and that conviction has been subjected to appellate procedure. It should not be upset and Witcher released upon an offering of improper arithmetic as expressed in percentages calculated upon inappropriate inputs.