**Thomas Carlton WANSLEY, Appellee,**

v.

**A. E. SLAYTON, Superintendent of the Virginia State Penitentiary, Appellant.**

**No. 73-1151.**

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1973.

Decided Nov. 8, 1973.

Gilbert W. Haith, Asst. Atty. Gen. of Va. (Andrew P. Miller, Atty. Gen. of Va., on brief), for appellant.

William M. Kunstler, New York City (Philip J. Hirschkop, Alexandria, Va., and Charles M. L. Mangum, Lynchburg, Va., on brief), for appellee.

Before BOREMAN, Senior Circuit Judge, and RUSSELL and FIELD, Circuit Judges.

RUSSELL, Circuit Judge:

The petitioner is a state prisoner, convicted of rape and robbery in the Corporation Court of Lynchburg, Virginia, in March, 1967. The alleged offense occurred in December, 1962. The petitioner had been tried twice earlier. At the first trial in February, 1963, he was convicted but his conviction was reversed by the Virginia Supreme Court. Wansley v. Commonwealth (1964) 205 Va. 419, 137 S.E.2d 870.[1] The second trial on the robbery charge in October, 1966, resulted in a mistrial. In this third trial, held almost five years after his alleged offense, the petitioner was convicted. He appealed his conviction to the State Supreme Court, which affirmed[2] and unsuccessfully sought certiorari in the United States Supreme Court.[3] He then filed this proceeding in the District Court. He was granted *habeas* relief by the District Court and the Commonwealth has appealed. We reverse with directions to dismiss the petition.

The District Court based its grant of relief on three grounds: 1. Prejudicial pre-trial publicity; 2. Improper admission of evidence; and 3. Illegal grand jury. We shall consider *seriatim* these grounds.

## I.

■ The first position asserted by the petitioner and upheld by the District Court was that the trial court denied him the right to a fair and impartial trial by refusing his motion for a change of venue based on prejudicial pre-trial publicity. It is well established that due process requires that an accused receive a trial by a fair and impartial jury "free from outside influences";[4] and if there has been publicity which, by reason of its impact on the jury, raises the "reasonable likelihood"[5] or probability that the accused has been prejudiced in his right to a fair trial, the trial court is obligated to take appropriate steps to determine whether in fact the accused can secure under the circumstances a fair trial.[6] Whether there has been such prejudicial publicity requiring action by the Court is to be determined by an evaluation of "the totality of the surrounding facts" in the matter.[7] Ordinarily, under such a rule, the evaluation will be based both on the pre-trial publicity complained of and on its impact, if any, on the jury,[8]

---

1. In reversal, the Supreme Court showed great concern to protect the rights of the petitioner, observing (p. 873, 137 S.E.2d):

   "In the instant case human life is involved, indeed the life of an ignorant boy 17 years of age has been declared forfeited, and the question to be determined is whether or not the accused, who has been sentenced to suffer the extreme penalty, has had that fair and impartial trial guaranteed to him by our constitution."

2. Wansley v. Commonwealth (1970) 210 Va. 462, 171 S.E.2d 678.

3. Cert. denied 399 U.S. 931, 90 S.Ct. 2264, 26 L.Ed.2d 801 (1970).

4. Sheppard v. Maxwell (1966) 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600.

5. Sheppard v. Maxwell, *supra*, p. 363, 86 S.Ct. 1507.

6. Sheppard v. Maxwell, *supra*, pp. 358–362, 86 S.Ct. 1507.

7. Irvin v. Dowd (1961) 366 U.S. 717, 721, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751.

8. *See* Ignacio v. People of Territory of Guam (9th Cir. 1969) 413 F.2d 513, 518, cert. denied 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124, where, in speaking to a contention similar to that raised here, the Court said:

   "* * * It is not sufficient to simply allege adverse publicity without a showing that the jurors were biased thereby."

   The proper procedure is outlined in Margoles v. United States (7th Cir. 1969) 407 F.2d 727, cert. denied 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84, where the Court, after stating that, "Assuming for purposes of this opinion that prejudicial publicity was present, the question before us is whether the procedures employed by the trial court adequately protected petitioner's right to a fair trial," (at 729) concluded:

   "We hold that the procedures employed by the district court at the *voir dire* ex-

as developed through adequate *voir dire* examination of the jurors.[9] The recency of prejudicial publicity is important in determining whether such publicity is likely to affect an accused's right to a fair trial.[10] Obviously, where considerable time has elapsed since publication, the probability or likelihood of impact is appreciably lessened. This has been recognized in the construction given Rule 21(a), Federal Rules of Criminal Procedure, authorizing a change of venue in federal criminal trials where there has been impermissibly prejudicial pre-trial publicity. To warrant a change of venue under this rule, the publicity must have been "recent, widespread and highly damaging to the defendants." 1 Wright, Federal Practice and Procedure, § 342, p. 623. The same principle has been applied where State trials were under review on due process grounds. Uniformly, in the State trials, in which federal *habeas* relief has been sustained by the Supreme Court on the ground of prejudicial publicity, the inflammatory

and prejudicial publicity has been close in time to the actual trial. Thus, in Irvin v. Dowd, *supra* (366 U.S. 717 at p. 725, 81 S.Ct. 1639, at p. 1644), "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his [the defendant's] trial." In Sheppard v. Maxwell, *supra* (384 U.S. at p. 333, 86 S.Ct. 1507), the massive prejudicial publicity continued through the trial itself, to all of which the jurors trying the case were exposed.[11] Beck v. Washington (1962) 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98, presents the reverse situation and prompted a contrary result. There, it was concluded that a lapse of nine and a half months was sufficient time for the impact of any prejudicial publicity to subside. Taken as a whole, then, the relevant decisions of the Supreme Court, as well as of lower federal courts, emphasize, as does the Federal Criminal Rule, that recency is a critical factor to be considered in connection with any claim of

amination of prospective jurors were adequate to safeguard petitioner against the effect of prejudicial pre-trial publicity, protected his right to a fair trial, and met the standards set by the Supreme Court and by this Court in dealing with similar cases." (p. 730)

*See, also,* McWilliams v. United States (8th Cir. 1968) 394 F.2d 41, 44, cert. denied 393 U.S. 1044, 89 S.Ct. 643, 21 L.Ed.2d 593.

9. *See,* Blumenfield v. United States (8th Cir. 1960) 284 F.2d 46, 51, cert. denied 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692, and re-affirmed in Koolish v. United States (8th Cir. 1965) 340 F.2d 513, 526, cert. denied 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724.

"It is clear that the mere presence of adverse publicity does not per se establish proof of prejudice, or necessarily establish that a defendant will be unable to obtain a fair trial within the district. The mere fact that a juror has read newspaper accounts relative to a criminal charge is not in itself sufficient grounds for excusing a juror.' Finnegan v. United States, 8 Cir., 204 F.2d 105, 110, certiorari denied 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347. The ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the *voir dire* examination."

10. *See,* United States v. Bowe (2d Cir. 1966) 360 F.2d 1, 12, cert. denied 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306, reh. denied 386 U.S. 969, 87 S.Ct. 1040, 18 L.Ed.2d 127, where the Court very clearly marks out the difference between "prejudicial information during the trials" and prejudicial publicity antedating trial in distinguishing United States v. Accardo (7th Cir. 1962) 298 F.2d 133, and Coppedge v. United States (1959), 106 U.S.App.D.C. 275, 272 F.2d 504, cert. denied 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52, both of which involved "exposure of jurors to prejudicial information during the trials."

11. The extraordinary circumstances of this case were accurately summarized in Myers v. Frye (7th Cir. 1968) 401 F.2d 18, 20, thus:

" * * * in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, no effort was made to insulate the jury from trial publicity, two jurors admitted reading highly inflammatory material, a pre-trial inquest was televised live, and prospective jurors received anonymous letters after pictures of the jurors accompanied by their names and addresses appeared in the press."

pre-trial prejudicial publicity.[12] Finally, the burden of establishing prejudicial pre-trial publicity rests on him who asserts it.[13] Whether the defendant has sustained that burden is a matter to be independently evaluated, on appellate review, on a consideration of the record.[14]

The pre-trial publicity on which the District Court predicated its findings is identified and discussed in its opinion. That prejudicial of the accused's claim of innocence was published largely "within two weeks after Wansley's arrest." It followed a series of rapes and robberies in the community apparently committed by the same person. It was stated in the record that four separate rapes had been committed. Three whites and a black were the victims. Naturally, there was considerable publicity. When Wansley in the latter part of 1962 was arrested and charged with the crimes, his apprehension and arrest were given a great deal of publicity by the local press. His picture was published under the caption, "Rapist Caught". The police authorities were quoted to the effect that the petitioner had "confessed to raping two women and attacking one." It was stated that he had retraced his trail of crime for the authorities. There were other alleged details given in these articles in late 1962 and early 1963. As the District Court found, there can be little question that these articles were prejudicial to accused's rights in any trial held quickly thereafter. The petitioner's first trial followed close on their publication. *But we are not concerned*

*with that trial or its fairness*; the Virginia Supreme Court reversed the petitioner's conviction at that trial. *And the prejudicial publicity which preceded such trial took place almost five years before the trial with which this petition is concerned.* This publicity, concededly adverse and prejudicial can, under no possible theory, be regarded as "recent" as it relates to petitioner's trial in 1967. If a proper remedy for such adverse publicity is, as *Sheppard* suggests, to "continue the case until the threat [of the adverse publicity] abates",[15] certainly a trial almost five years later represents an appropriate delay; it undoubtedly is far more than was found in *Beck* to be sufficient to offset widespread publicity of a very damaging character. Moreover, between the trial in 1963 and the trial in 1967, newspaper interest in Wansley's case—and we may assume local interest, too, for otherwise the press would not have been so reticent—abated and there were only occasional references to his case and then only when some court proceedings were imminent. Any specific newspaper references to the petitioner made during this period, as they are described in the District Court's opinion, were matter-of-fact statements, clearly not flamboyant or inflammatory. They consisted primarily of descriptions of the petitioner as "twice-convicted", included in a report that he was to be retried. So far as the opinion of the District Court would indicate, there was no reiteration of any statement that petitioner had confessed;

12. See, United States v. Bowe, *supra* (360 F. 2d 1, at p. 11):
    "By direct contrast, the adverse publicity in the present case appeared several months prior to the trial and the importance of this time-lag cannot be overlooked. Both the Supreme Court and this court have indicated that the length of time between the publication of adverse publicity and the empaneling of the jury is a significant factor in assessing claims of prejudice resulting from pre-trial publicity [citing cases]. Since the articles involved here were twelve weeks old at the time the jury was empanelled, it is highly un-

likely that they were retained in the memories of the jurors."

13. Mikus v. United States (2d Cir. 1970) 433 F.2d 719, 723, citing Irvin v. Dowd, *supra* (360 U.S. 717 at 723, 81 S.Ct. 1639).

14. Irvin v. Dowd, *supra* (360 U.S., at p. 723, 81 S.Ct. 1639). For an interesting discussion of this subject, see Stanga, Judicial Protection of the Criminal Defendant Against Adverse Press Coverage, 13 Wm. & Mary L.Rev. 1 (1971).

15. See 384 U.S. at p. 363, 86 S.Ct. at p. 1522.

no details of the alleged crime were set forth; there was no reference to any testimony at the prior trials. Too, the facts published were accurate: The petitioner had been "twice convicted" and he was to be "retried". The petitioner complains, though, that the news articles should have explained that his two convictions had been reversed.[16] It would seem that this would have necessarily followed from the statement that he was to be "retried". There would have been no occasion for a retrial had his convictions not been reversed. It is scarcely to be assumed that such sparse references to the petitioner as these between 1963 and 1967 could have created an atmosphere of community prejudice against the petitioner. What was printed in the local press in this period was the normal court items that appear regularly in the press. To find such so prejudicial as to render a trial held in the community where they were published violative of due process would mean that few trials could ever be held in a land where freedom of the press is considered invaluable. The most strongly pressed complaint of the petitioner on publicity in the period from 1963 to 1967 deals with comments published from time to time, *not about the petitioner, but about one of his counsel.* Whenever the press published the information that petitioner was to be tried, it often referred to one of his counsel, a national figure whose name had often appeared in the news, as an attorney who "has been linked on numerous occasions with Communist-front organizations and efforts." It is doubtful, however, that any pre-trial reference in the press to an accused's attorney in the absence of any prejudicial or unfair com-

ment on the accused himself or the merits of his offense, can justify a finding that the accused's right to a fair trial has been so prejudiced that due process is violated.[17]

The District Court made reference, also, in its opinion on this point, to two other items, neither of which it would seem is particularly relevant. One was an editorial in the local papers, answering a criticism leveled at those papers, by the student publication at a local college. The editorial was published on April 4, 1967, some week or more after the petitioner's trial. Manifestly, it could have had no impact on the defendant's trial. The other item involved a petition signed and published by a large number of "prominent Lynchburg citizens." In this petition, the local press was soundly criticized for contributing to the "frustration and bitterness" developing among the Negro citizens by the paper's policies. When this petition was prepared is not clear from the record but in any event practically every signer of the petition affirmed that the petition was without reference to this case. Moreover, the petition, signed as it was by what the District Court found was such an influential section of the local citizenry, demonstrated rather convincingly that the local press had many powerful detractors and critics in the local community and could not be taken as an accurate or reliable barometer of local opinion.

■ To summarize the record on the extent and nature of pre-trial publicity as specified and relied on in the opinion of the District Court: The newspaper coverage which may have been prejudicial to petitioner occurred almost five years

---

16. Wansley v. Commonwealth (1964) 205 Va. 412, 137 S.E.2d 865 and Wansley v. Commonwealth (1964) 205 Va. 419, 137 S.E.2d 870 (*Carter case*). There were originally two cases, both tried in 1963 and both resulting in convictions of the petitioner. After reversal, it was learned that Mrs. Fleshman, one of the complainants, had returned to Hawaii and was unavailable as a witness for retrial. The proceedings arising out of

her alleged rape were dismissed. This explains the reference to "twice convicted" and also explains why only the *Carter* case was retried.

17. Cf., United States v. Barber (D.C.Del. 1969) 297 F.Supp. 917, 921, aff'd. 442 F.2d 517 pp. 528–529 (reversed in part on other grounds).

before the trial in question; all recent news accounts, though including perhaps derogatory references to one of petitioner's counsel, were restrained and matter-of-fact in any references to the petitioner himself and included no adverse comments on the issue of his actual guilt; there were none of the flagrant violations committed on the eve and during the trial that marked the situations in either Rideau v. Louisiana (1963) 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, or Estes v. Texas (1965) 381 U.S. 532 at 552, 85 S.Ct. 1628, 14 L.Ed.2d 543, reh. denied 382 U.S. 875, 86 S.Ct. 18, 15 L. Ed.2d 118, where the Court found "inherent prejudice." So much the District Court apparently recognized for it summed up its review of the pre-trial publicity with the statement that, "[T]he existence of the above recited inflammatory press coverage would not by itself, *ipso facto,* indicate that a fair trial was precluded", and it proceeded, as it was obligated to do, to a review of the *voir dire* examination of the jury in order to ascertain whether pre-trial publicity had had such an impact on the jury venire that an impartial jury was unavailable.[18]

The *voir dire* examination of the veniremen was extensive.[19] Painstakingly pursued by defendant's counsel, whose expertise in this field was clearly evi-

dent, it comprises some four hundred pages of testimony, wherein every facet of a venireman's attitude and knowledge of the case was scrupulously probed.[20] Any venireman who expressed a prejudicial attitude toward defendant or his counsel was struck for cause.[21] In addition, each party was allowed to use four peremptory strikes. The veniremen generally admitted that they had read news coverage relating to defendant's case at some time but did not remember any details. It was but natural that the earlier news accounts, giving details of the defendant's alleged crime and his alleged confession, and occurring as they had almost five years in the past, would necessarily have been obscure at this time in the memory of even these veniremen who may have read them when published. None of the jurors empanelled had formed an opinion concerning petitioner's guilt or innocence or entertained, according to their sworn testimony, any bias or prejudice against the petitioner's attorney that might color their verdict. Actually, some of the veniremen expressed a very strong skepticism about the accuracy of items appearing in the press. The District Court found that, "[T]hose veniremen chosen for the jury panel *on the face of their own statements* appear to meet" the standards es-

---

18. The issue under these circumstances was phrased in United States v. Denno (2d Cir. 1963) 313 F.2d 364, 372, cert. denied 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963), in these terms:

"* * * The reviewing court must determine, from a review of the entire voir dire, whether the extent and nature of the publicity has caused such a build up of prejudice that excluding the preconception of guilt from the deliberations would be too difficult for the jury to be honestly found impartial."

19. Before the *voir dire* examination began, the trial court advised counsel for the defendant:

"As I advised you before, the Court is going to be very lenient with you, in the examination of the prospective jurors, so that if there is any way possible, the jurors can be ascertained whether or not

they have any prejudice for or against the accused in this case; so that every safeguard will be met, in order to assure this accused a fair and impartial jury."

20. Contrast the wide latitude allowed by the trial court in the *voir dire* examination with that in United States v. Dellinger (7th Cir. 1972) 472 F.2d 340, 375, cert. denied 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706.

21. Because of the disqualification of all who had formed, however tentatively, an opinion, the trial court did what the trial court did in Tasby v. United States (8th Cir. 1971) 451 F.2d 394, 397, cert. denied 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972), where the appellate court said: "We believe that the qualifications possessed by the selected jurors exceeded the requirements for an impartial jury as articulated in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)."

tablished for a fair and impartial jury.[22] It chose, however, relying on an experience of "over 22 years of trial experience" that "certain veniremen would express, in sincere belief, an impartiality when faced with the duty of sitting on a jury, despite conscious or unconscious reservations", to find the testimony of the jurors on *voir dire* unbelievable.[23] It did so because "all but a very few veniremen called had admitted knowledge of the case."[24] It likened the situation in this case to that prevailing in Irvin v. Dowd, *supra* (366 U.S. 717, 81 S.Ct. 1639), and relied on that decision for its ultimate conclusion. Particularly, it found significant that the writer of the opinion in *Irvin* used the phrase *"cause célèbre"* in describing the case under review there and the editorial, published after the trial in this 'case, used the same phrase. What the District Court overlooked, however, in its analysis of *Irvin*, was that the publicity involved there was "a barrage" of prejudicial "newspaper headlines, articles, cartoons and pictures * * * unleashed against him [the accused] during the six or seven months preceding his trial."[25] Included in this publicity on the eve of trial were press releases stating that the petitioner had confessed "to the six murders" and statements that the

accused would "plead guilty if promised a 99-year sentence".[26] And his extensive prior criminal record was fully detailed in the newspapers on the eve of trial. This is quite different from the facts in this case. The only really damaging publicity about the accused, involving the details of his crime and his alleged confession, did not occur just "preceding his trial" but almost five years earlier. Moreover, it was not the fact that the jurors in *Irvin* had read or heard of the accused's case that determined the Court's decision. The Court said, "[I]t is not required, however, that the jurors be totally ignorant of the facts and the issues involved."[27] It went beyond this to add that, "[T]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard."[28] What motivated the Court's decision in *Irvin* was that it was established by the *voir dire* examination that, "[E]ight out of the 12 [jurors who sat on the accused's case] thought petitioner was guilty."[29] In fact, some of the jurors had gone "so far as to say that it would take evidence to overcome their beliefs".[30] One juror said he "could not

---

22. Wansley v. Miller, 353 F.Supp. 43 at p. 51 (emphasis in opinion).

23. 353 F.Supp. at p. 51.

24. 353 F.Supp. at p. 51.

25. 366 U.S. at p. 725, 81 S.Ct. at 1644.

26. 366 U.S. at pp. 725–726, 81 S.Ct. at 1644.

27. 366 U.S. at p. 722, 81 S.Ct. at p. 1642.
*See, also*, Hale v. United States (5th Cir. 1970) 435 F.2d 737, 746, cert. denied 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142:
" * * * potential jurors need not be totally ignorant of the facts of a case."

28. 366 U.S. at p. 723, 81 S.Ct. at p. 1642.
*See* Evans v. State of Arizona (9th Cir. 1969) 410 F.2d 1122, 1124:
"The fact that several jurors, or all the members of a panel, have read newspaper articles relating to a case does not disqualify them as jurors. This is true even though a juror may have had a precon-

ceived notion as to the guilt or innocence of an accused."

To the same effect: Reynolds v. United States, (1878) 98 U.S. 145, 155–156, 25 L. Ed. 244; Holt v. United States (1910) 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021; Beck v. Washington, *supra* (369 U.S. 541 at p. 557, 82 S.Ct. 955, 8 L.Ed.2d 98); Finnegan v. United States (8th Cir. 1953) 204 F. 2d 105, 110, cert. denied 346 U.S. 821, 74 S. Ct. 36, 98 L.Ed. 347; reh. denied 346 U.S. 880, 74 S.Ct. 118, 98 L.Ed. 387; Koolish v. United States, *supra* (340 F.2d 513 at p. 526); Gawne v. United States (9th Cir. 1969) 409 F.2d 1399, 1401, cert. denied 397 U.S. 943, 90 S.Ct. 956, 25 L.Ed.2d 123, reh. denied 397 U.S. 1059, 90 S.Ct. 1368, 25 L.Ed. 2d 680.

29. 366 U.S. at p. 727, 81 S.Ct. at p. 1645 (Italics added).

30. 366 U.S. at p. 728, 81 S.Ct. at p. 1645.

\* \* \* give the defendant the benefit of the doubt that he is innocent."[31] Another testified on *voir dire* that "he had a 'somewhat' certain fixed opinion" of the accused's guilt.[32] On that record, the Court concluded—and this was the heart of its decision—that, "[W]here so many, so many times, admitted prejudice, such a statement of impartiality [by the jurors] can be given little weight."[33] There is no such showing in this case and *Irvin* is not analogous on its facts to this case. As we have seen, not a one of the veniremen "thought petitioner was guilty", or expressed doubt about his ability to "give the defendant the benefit of the doubt that he is innocent." All the jurors who served on the jury convicting the petitioner, testified unequivocally on *voir dire* that they would go strictly by the evidence in reaching any conclusion on the petitioner's guilt or innocence. This case is similar to United States ex rel. Rosenberg v. Mancusi (2d Cir. 1971) 445 F.2d 613, cert. denied 405 U.S. 956, 92 S.Ct. 1186, 31 L.Ed.2d 234. There the prejudicial publicity occurred about eight months before trial. All the jurors selected "vaguely recalled the news coverage of the case" but only one recalled any details of the crime and he "insisted that he could render a verdict on the facts elicited at trial."[34] After quoting from *Irvin*, the Court found the jury competent. We think it equally clear, again under *Irvin*, properly applied, that this jury was competent and that the District Court was in plain error in concluding otherwise.

▆▆▆▆ The petitioner, however, asserts that the findings and conclusions of the District Court are only to be reversed if "clearly erroneous". The question posed by this claim of prejudicial publicity is "one of mixed law and fact" and as such is one where "the duty of the Court of Appeals" is "to independently evaluate the *voir dire* testimony of the impaneled jurors."[35] And this Court is equally able to do so, since we are in the same position as the District Judge in evaluating the record and in reviewing the findings of the State Court: Neither the District Court nor this Court has had the benefit of observing the jurors and hearing their testimony in person; both must act on the basis of the written record.[36] Moreover, a finding is "clearly erroneous" when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed";[37] and, on the basis of our independent review of the record—a review we are commanded to make—we are of the firm conviction that the record does not justify a finding that due process was denied the defendant in his trial because of prejudicial pre-trial publicity requiring the granting of his motion for a change of venue.

31. 366 U.S. at p. 728, 81 S.Ct. at p. 1645.

32. 366 U.S. at p. 728, 81 S.Ct. at p. 1645.

33. 366 U.S. at p. 728, 81 S.Ct. at p. 1645.

34. 445 F.2d at p. 618.

35. Irvin v. Dowd, *supra* (366 U.S. at p. 723, 81 S.Ct. at p. 1643) ; Sheppard v. Maxwell, *supra* (384 U.S. 333 at p. 362, 86 S.Ct. 1507, 16 L.Ed.2d 600) ; Gawne v. United States, *supra* (409 W.2d at p. 1401).

36. *See*, Orvis v. Higgins (2d Cir. 1950) 180 F.2d 537, 539–540, cert. denied 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950). Ordinarily, the resolution of a motion for change of venue rests with the trial court and its decision is to be reversed only for abuse of discretion or, as *Irvin* puts it, "where prejudice is 'manifest'." (366 U.S. at p. 724, 81 S.Ct. 1639) Dosek v. United States (8th Cir. 1968) 405 F.2d 405, 408, cert. denied 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461. In United States v. Bowe, *supra* (360 F.2d 1, at p. 11), the Court said: " \* \* \* Whether publicity is so prejudicial that it forecloses the possibility of a fair trial is a determination which is well-suited for the trial judge since he has an opportunity to observe the impact of publicity on the jurors. Consequently, he should have wide discretion to assess such matters and his view should be determinative unless that discretion is abused."

37. United States v. Gypsum Co. (1948) 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

## II.

The second ground on which the District Court predicated a grant of *habeas* relief concerns the admission of certain testimony of a juvenile court employee in Lynchburg. At the time of his arrest, the petitioner was seventeen years of age and was within the initial jurisdiction of the juvenile courts as established in Virginia. The witness was the chief probation officer of that court. Following petitioner's arrest, his mother was notified and she came to the jail to visit him. The witness accompanied the mother. This seemingly was routine and there is no suggestion of any improper purpose in the officer's action. When the mother saw her son she inquired whether he was guilty and spontaneously he replied in the affirmative. The officer who was standing near the mother testified to the conversation between mother and son. It is this conversation, the admission of which the District Court found constitutionally proscribed.

■ The State Supreme Court, on appeal, found the testimony admissible, stating (171 S.E.2d 678 at p. 684):

"Suffice it to say, in rejecting this contention, that counsel overlook, or brush aside the fact that Wansley's spontaneous admission resulted from an unprompted question asked by his mother, not from questioning by Read or the police or any other person."

In holding to the contrary, the District Court recognized at the outset that the admissibility of evidence at State Court trials is ordinarily "not cognizable on federal habeas corpus" and that the rule in *Miranda*[38] was not applicable, but concluded that the admission of such evidence offended "fundamental fairness" because it arose out of a violation of the witness' "role as a juvenile court officer,

a *parens patriae*."[39] It relied for this conclusion on a line of cases from the District of Columbia Circuit, the first of which was Harling v. United States (1961) 111 U.S.App.D.C. 174, 295 F.2d 161, and the last, Harrison v. United States (1965) 123 U.S.App.D.C. 230, 359 F.2d 214. In those cases, however, unlike the situation here, the admission or confession, which had been held excludable, had been given in response to police interrogation and the decisions did not purport to cover spontaneous statements such as was involved here. That is made clear in *Harrison*, where the Court pointedly remarked that "*Harling* puts to one side, as we do, the case of spontaneous statements. What are involved here are statements secured by police questioning and confrontation."[40] It is plain from this expression that the decisions from the District of Columbia Circuit recognize by implication the admissibility of the challenged evidence and sustain the result reached by the State Supreme Court. We agree.

■ Of course, the officer was subjected to sharp cross-examination on this testimony, and it was argued by petitioner's counsel that the statement, if made, related to another offense. But whether the testimony was to be believed was a matter for resolution by the jury and was not a proper basis for denial of admissibility. It may be noted parenthetically that the mother did not dispute the officer's testimony.

## III.

The final basis on which the District Court acted was that the petitioner was indicted by a grand jury from which blacks were "deliberately and systematically excluded."[41] This, it found, violated the petitioner's constitutional rights. In reaching this conclusion, it relied on

---

38. Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

39. 353 F.Supp. pp. 54, 55.

40. 359 F.2d at p. 223 (*rehearing en banc*).

41. As originally stated the attack was broader but the decision of the District Court was based on the charge of racial discrimination and, on appeal, the petitioner has confined himself to this charge. It is unnecessary, therefore, to consider the other claims.

the rule stated in Hairston v. Cox (4th Cir. 1972) 459 F.2d 1382 at 1384, cert. denied 411 U.S. 986, 93 S.Ct. 2266, 36 L.Ed.2d 963, that, "[A]dequate evidence of exclusion may be demonstrated by evidence of 'disproportionate representation [which] was recurrent, systematic and relatively uniform in degree.' " [42] And it found its standard for determining "disproportionate representation" in Stephens v. Cox (4th Cir. 1971) 449 F.2d 657, wherein it was "stated that a two to one disparity 'will establish a *prima facie* case of racial discrimination, if the disparity is coupled * * * with a showing that the selection procedure provides an "opportunity for discrimination.' " [43] It concluded that, while the selection process for grand jurors in this case was "more random than that described in *Witcher*", [44] and for that reason it was "reluctant to find *Witcher* dispositive of the issue *ipso facto*", [45] it did conclude that the "statutory scheme for grand jury selection" in this case, which was similar to that involved in *Witcher* and *Hairston*, provided "an opportunity for discrimination". [46] It then concluded that the undisputed record established a pattern under which there had been both a "recurrent" and "relatively uniform" "two to one [racial] disparity" [47] in grand jury selection in Lynchburg, thereby establishing, when coupled with the opportunity for discrimination present in the jury selection process, the constitutional invalidity of the grand jury that indicted the petitioner.

▌ Without reviewing all the conclusions reached by the District Court, it seems sufficient that, in our opinion, the record does not, by any standard of "two to one", or any other standard of representation adopted in the authoritative decisions, establish a pattern of systematic and deliberate exclusion of blacks in the selection of grand juries in the Corporation Court of Lynchburg; [48] and it must be remembered that the burden of establishing such pattern rests on petitioner. Swain v. Alabama *supra* (380 U.S. p. 205, 85 S.Ct. 824, 13 L.Ed.2d 759). In fact, the record positively establishes the contrary. It is conceded that the percentage of blacks in the Lynchburg population is approximately 23 per cent. Under the "two to one" test, as stated by the District Court, a systematic pattern of grand jury selection, in which the proportion fell below 12 per cent, would "establish a *prima facie* case of racial discrimination," assuming opportunity for discrimination. The record, however, completely negatives any such finding. Grand juries under Virginia law vary in number from 5 to 7. There was uncontradicted evidence that at no time for many years before petitioner's indictment had any grand jury in this court had less than one black. In instances, it included more but never was there less than one black. There was one black on the grand jury that indicted the petitioner. Since there were seven jurors on the grand jury that indicted the petitioner, that meant black representation on that grand jury was, stated percentage wise, 14 per cent, as against a black representation in the community population of 23 per cent. And this "more than 14 per cent" represented what had been, under the undisputed testimony, the absolute minimum of black grand jury representation in the Lynchburg Court for many years. Of course, in those cases where the grand jury consisted of five, the black population rose to a minimum of 20 per

42. 353 F.Supp. at p. 52.

43. 353 F.Supp. 53.

44. Witcher v. Peyton (4th Cir. 1969) 405 F.2d 725.

45. 353 F.Supp. at 52.

46. 353 F.Supp. at 53.

47. 353 F.Supp. at 52, 53.

48. *Cf.*, White v. State (1973) 230 Ga. 327, 196 S.E.2d 849, and dissenting opinion of Justice Brennan, certiorari denied (Justice Brennan, Douglas and Marshall dissenting), 10/15/73, 414 U.S. 886, 94 S.Ct. 222, 38 L.Ed.2d 134; Swain v. Alabama (1965) 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

cent, and if there were as many as three blacks on a grand jury, which testimony indicated had occurred, the black proportion was greater still. But, however viewed, the disproportion never reached the point of "two to one", which was the standard followed by the District Court in determining whether the petitioner had established his *prima facie* case of disproportionate representation, or, for that matter, any "10%" rule under *Swain,* and there was no basis under *Hairston* and related cases for finding the grand jury indictment constitutionally defective.

The District Court based its finding of disproportionate representation on a statistical analysis of grand jury composition in the Corporation Court for the five year period 1962–7. This compilation began with May, 1962, about six months before the grand jury returned its indictment of the petitioner. For some reason, no attempt was made to compile figures on grand jury compositions in the five year period prior to petitioner's indictment. This would, it seems, have been the pertinent period to review. But, even under the post-indictment compilation, the petitioner failed to make out a *prima facie* case. According to the compilation offered by the petitioner there were 169 grand jurors selected in this five year period of whom 20 or 12 per cent were black. The difficulty with this statistic is that it does not purport to show the racial composition of the actual grand juries themselves, as selected over this period. The evidence established that many grand jurors served more than once. It accordingly became evident immediately that the use of the raw numbers of the entire jury lists for the five year period, without an examination of the actual juries empanelled is misleading. That many on the list served more than once is established by the record in this case. Thus, the foreman of the grand jury that indicted the petitioner had served

"four or five times" on the grand jury. Two had been on "several times". It must be remembered that the testimony of the court clerk, as well as the affirmation of the Court Judge, was undisputed that, as long as they had been connected with the Court (which long preceded the indictment of the petitioner and continued long beyond the trial in question), there had been one or more blacks on every grand jury that served. That uncontradicted testimony fixed the pattern of actual selection and it gave no basis in fact for a finding of a "two to one" disproportion in racial representation. Moreover, under the petitioner's own compilation, the underrepresentation did not meet the "2 to 1" test.[49] The finding of the District Court that the undisputed evidence established a *prima facie* case of underrepresentation was clearly erroneous.

Reversed, with directions to the District Court to dismiss the petition for *habeas* relief.

49. The black representation on the list prepared by the petitioner was 12% and the proportion of blacks in the population was 23%.