**Frank Ervin ALTIZER, Jr.**

v.

**E. L. PADERICK, Sup't., et al.**

**Civ. A. No. 74-0406-R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 5, 1975.

Thomas F. Coates, III, Richmond, Va., for plaintiff.

Alan Katz, Asst. Atty. Gen. of Va., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Frank Altizer, a Virginia prisoner, brings a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, wherein he alleges that his present confinement is in violation of the Constitution of the United States. The petitioner has raised all pertinent issues on appeal to the Supreme Court of Virginia, which denied his petition for a writ of error by order of June 6, 1974. Accordingly, the Court finds the petitioner has exhausted his state remedies as required by 28 U.S.C. § 2254 and the issues he now raises are ripe for determination.

The petitioner is currently confined in the Virginia State Penitentiary pursuant to three judgments entered by the Circuit Court for the City of Fredericksburg on August 29, 1973. Those judgments were entered by the Court upon jury verdicts adjudging the petitioner guilty of abduction, sodomy and rape and fixing his punishment at life imprisonment on each of the abduction and rape charges and ten years imprisonment on the charge of forcible sodomy. The convictions were obtained following a trial at which the petitioner, represented by retained counsel, had entered pleas of not guilty.

## STATEMENT OF FACTS

The Court has examined the state proceedings in this matter and finds the relevant facts to be as follows: On January 11, 1973, one Dora Winston Heflin, then eleven years of age, received a telephone call at approximately 5:15 p. m. from a man who identified himself as a Dr. Phillips. The caller indicated that he was conducting a survey for the Fredericksburg school system and he asked Miss Heflin several questions. During their conversation, the caller arranged to meet Miss Heflin outside of her home in the Confederate Ridge Subdivision of Fredericksburg. As a result, Miss Heflin walked outside of her home at approximately 6:00 p. m. and met a man who again identified himself as Dr. Phillips.

At this point, according to Miss Heflin's testimony at trial, the man grabbed her by the arm, indicated that he had a gun, and told her that if she wanted to go home again that night she had better do as he said. The man then led Miss Heflin into some woods adjacent to the roadway and proceeded to rape her and force her to commit

acts of sodomy. After the attack, the man allowed Miss Heflin to leave the wooded area, whereupon, in running to a neighbor's home, Miss Heflin saw a white car parked in the vicinity near where she had first met the stranger.

The neighbors to whose home Miss Heflin ran then notified her parents and the police of the incident. When the police arrived, Miss Heflin gave them a desciption of her assailant as a man who was "sort of heavy" and who "had bushy hair." Miss Heflin was then taken to a hospital where she received medical assistance for the injuries she had sustained. At that time her clothes were also taken into police custody for evidentiary purposes.

On January 27, 1973, Investigator Martin of the Virginia State Police took seven photographs which were on file with the State Police and displayed them to Miss Heflin in the presence of an officer of the Fredericksburg Police Department. All of the photographs presented depicted Caucasian males of approximately the same age and physical features. Of the seven photographs, two contained only frontal views, four contained both frontal and side views, and one, the photograph of the petitioner, contained two sets of both frontal and side views, or a total of four individual pictures. After viewing the photographs, Miss Heflin selected the picture of the petitioner as being that of her assailant.

In the early morning hours of January 28, 1973, Investigator Martin obtained a warrant for the petitioner's arrest, as well as two search warrants, one for a 1967 white Chevrolet owned by the petitioner's wife and one for the dwelling in which the petitioner resided in the City of Richmond. All three warrants were executed shortly after their issuance. During the course of the search of petitioner's home at 1435 Minefee Street, Investigator Martin seized two pair of men's trousers, a pair of men's work boots with ripple soles and numerous writings. In executing the search warrant on the 1967 Chevrolet, Investigator Martin seized a man's brown jacket, a wallet containing the petitioner's operator's license and personal effects, a letter from the Chevrolet Motor Division upon which appeared several handwritten telephone numbers, a note and address book, several pieces of paper and two tires. Also, later on the morning of January 28th, Investigator Martin caused two photographs to be taken of the petitioner.

On February 11, 1973, the petitioner was examined by a Fredericksburg psychiatrist who, in his report to the Fredericksburg Juvenile and Domestic Relations Court dated March 12, 1973, found that the petitioner was capable of understanding the nature of the charges against him and of assisting in his own defense. On April 19, 1973, a judge of the Juvenile Court ordered that the petitioner be committed for further psychiatric studies to determine his competency to stand trial. By letter dated May 8, 1973, the Clinical Director of Central State Hospital, to which the petitioner had been committed, confirmed the earlier findings and recommended that he be returned to the jurisdiction of the court.

A preliminary hearing was conducted in the Juvenile Court on June 1, 1973, following which the court certified the charges to the Grand Jury. The petitioner was indicted by the Grand Jury on all three charges on June 11, 1973 and he was tried in the Circuit Court for the City of Fredericksburg on August 29, 1973.

The petitioner's allegations concerning the denial of his constitutional rights are four in number. All of the claims he now raises were presented to the Circuit Court by petitioner's counsel in the form of appropriate pre-trial motions. The Circuit Court heard evidence on each claim during a pre-trial hearing and each motion was denied

by the Court prior to the start of petitioner's trial. The Court will deal with those allegations *in seriatim.*

## VENUE

Petitioner's initial claim, presented to the trial court by way of a motion for a change of venue, is that pre-trial publicity in the Fredericksburg area concerning his case was so extensive and prejudicial as to prevent him from obtaining a fair and impartial trial in that jurisdiction. At the hearing on his motion, conducted on the morning of his trial, petitioner offered the testimony of two local radio newscasters, both of whom indicated that the attack on Miss Heflin was the leading local news story on the day following the incident.

One of the two newscasters also related that he had made mention of the case on only two occasions, one the day after the attack and one the day after the petitioner's arrest. He further stated that on another occasion, a woman listener called the radio station during the course of a talk show and that, with reference to the alleged rape, she warned other parents in the area to be on the look-out for this type of activity. The newscaster indicated, however, that he did not believe those statements were relevant to the topic then being discussed and he attempted to dissuade the listener from further comment. Finally, in response to a question from petitioner's counsel as to whether the newscaster had aired a statement to the effect that it was a shame that public funds were expended to treat a person who had committed a crime in the area, the newscaster replied that he may have made such a statement.

Petitioner's counsel also read into the record eight articles which had appeared in the Fredericksburg Free Lance Star during the period of January 12, 1973 through June 12, 1973. The first, appearing on page two of the January 12th edition, related the facts surrounding the attack on Miss Heflin. The next, also appearing on page two of the January 29th edition, indicated that the petitioner had been arrested, that he was unable to post bond, that a Juvenile Court hearing had been scheduled and that his wife's car, which allegedly matched the description of the one used in the attack on Miss Heflin, had been impounded.

A third article appeared on page eight of the January 30th edition. In it was reported the fact that additional charges of sodomy and abduction had been lodged against the petitioner. The article also referred to the petitioner's arrest, that he was unable to post bond, and to the police report of the manner in which Miss Heflin had been lured from her home. It concluded by stating that the police had said that similar interviews through telephone calls, such as the one received by Miss Heflin, had been reported in other parts of the state.

Another brief article appeared on page two of the February 2d edition reporting that the petitioner had appeared in Juvenile Court the previous day and that his attorney had requested that a psychiatric examination be conducted. On February 3d, a fifth article appeared on page two in which it was reported that two detainers had been filed against the petitioner by Chesterfield County police charging him with sex offenses against a nine year old girl. It also related that the same *modus operandi,* involving a telephone survey by a man who identified himself as a Dr. Phillips, had been used in the Chesterfield County offenses. The article further noted that the petitioner's request for a psychiatric examination had again been granted and that he was to be examined by a local psychiatrist.

In the April 20th edition of the Free Lance Star, another article concerning the petitioner appeared, this time on page ten. It reported that the petitioner had been ordered committed to a state hospital for further psychiatric examination in accordance with the

recommendation of the local psychiatrist who had previously examined him. It also reiterated that two detainers lodged by the Chesterfield County police would remain in effect until disposition of the Fredericksburg charges.

On June 2d, a seventh article appeared on page two in which it was reported that the petitioner's case had been certified to the Grand Jury following a Juvenile Court hearing the previous day. It also reported the charges which had been filed against the petitioner and noted that a Free Lance Star reporter had been excluded from the Juvenile Court hearing after petitioner's counsel objected to the press being present. Finally, on June 12th, an article appeared on page three which reported that the petitioner had been indicted on charges of rape, abduction and sodomy and that the trial date had been set for July 27th.

■ The question of whether pretrial publicity has so prejudiced a defendant's right to a fair trial as to require a court to take appropriate measures to shift the situs of the trial, ordinarily must be evaluated in terms of both the publicity complained of and its impact, if any, on the jury as developed through adequate *voir dire* examination of the jurors. *Wansley v. Slayton*, 487 F.2d 90 (4th Cir. 1973), *cert. denied*, 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974). See also, *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). In terms of the former, the Court finds little, if anything, in the record of the venue hearing from which it might be inferred that the petitioner was the object of inflammatory press coverage.

■ Apparently, at no time, including the day following the attack on Miss Heflin or petitioner's arrest, were the circumstances surrounding petitioner's trial deemed to be of sufficient import to be carried on the front page of the Fredericksburg Free Lance Star. Further, while the location of the articles is far from determinative, their con-

tents appear to be nothing more than factual statements regarding the status of the preliminary proceedings. Moreover, the record indicates that the last article in the Fredericksburg press which mentioned the petitioner appeared approximately two and one-half months prior to his trial. Finally, as to radio coverage, an isolated comment by a newscaster questioning the expenditure of public funds to provide the petitioner with a psychiatric examination is patently insufficient to sustain the validity of petitioner's claim.

Assuming, however, for the purposes of completeness, that prejudicial pretrial publicity was present, the record discloses both that the impact on the jury of such publicity was minimal, at best, and that the trial court employed procedures which were adequate to protect the petitioner's right to a fair trial in this regard. After the initial *venire* panel of twenty members was sworn, the court inquired whether any member was related to the petitioner or Miss Heflin or had any interest in the outcome of the case. Immediately thereafter, the court stated:

> Now, do any of you know anything about the case—the three separate cases—or have you heard anything about the cases or about the alleged offense or the accused from the news media or other sources?

In response to this question, four veniremen raised their hands, following which the court asked:

> . . . Now, since you have indicated that you have heard something about the case, have you expressed or formed any opinion as to the guilt or innocence of the accused in these cases?

To this inquiry only one venireman responded and he did so in the negative. The following colloquy then occurred:

> The Court: Any others whose hands were held up formed or expressed any opinion as to the guilt or innocence of the accused?

Now, considering what you may have heard or read, do you believe that you can enter the jury box with an open mind and wait until the entire case is presented before reaching a fixed opinion as to the guilt or innocence of the accused? Is there anyone of you who cannot do so?

Now, any of you sensible of any bias or prejudice against either the Commonwealth or the accused in this case, Frank Ervin Altizer, Jr.?

Any of you know of any reason whatsoever why you should not give a fair and impartial trial to the Commonwealth and to the accused according to the law and the evidence?

The Juror: The only thing I can say, sir, is I am a neighbor to the young lady. I live within a block of her and I have known her father since childhood.

The Court: You are Mr. Strother Newman and you feel that there might be some reason why you should not give a fair and impartial trial in this case?

The Juror: There could be, sir.

The Court then gave counsel for the petitioner an opportunity to examine the veniremen. As to that part of counsel's questioning which is relevant to petitioner's claim of pre-trial publicity, counsel asked if any of the venire had read about the alleged occurrences from the Free Lance Star. Several veniremen responded that they had. Counsel then inquired if they had seen reference to it in the newspaper on more than one occasion. Again, several veniremen responded affirmatively. Finally, counsel asked if anyone had heard about the case on the radio, to which two veniremen, a Mr. Newman and a Mr. Ludlum, responded that they had. At this point counsel turned from the subject of publicity and proceeded along a different line of questioning.

At the close of counsel's examination of the initial venire panel, the court excused three members, including Mr.

Newman, on its own motion. An additional ten prospective jurors were then brought into the courtroom and the examination was repeated. Of those ten, five indicated in response to the court's inquiry that they had heard about the case from the news media or other sources. Of that group, two, a Mr. Labbe and a Mr. Hall, indicated, again in response to a question posed by the court, that they had formed an opinion as to the accused's guilt or innocence. Finally, the court asked yet another time:

> The Court: . . . The others who have not said that they formed an opinion, I will ask you if you have, considering what you have heard or read about the case, do the rest of you believe that you can enter the jury box with an open mind and wait until the entire case is presented before reaching a fixed opinion or conviction as to the guilt or innocence of the accused? If you feel you cannot, you can raise your hand. The others have already stated their positions.
>
> Now, any of you sensible of any bias or prejudice against the Commonwealth or the accused?
>
> Any of you know of any reason whatsoever why you should not give a fair and impartial trial to the Commonwealth and to the accused according to the law and the evidence which will be presented to you?

The record reflects that there was no response to this series of questions.

The Court then gave counsel another opportunity to examine the panel. Again, in relevant part to petitioner's initial claim, his attorney asked if anyone had read about the case in the Free Lance Star. Five members of the second panel indicated that they had. Next, counsel asked if they had heard of it on the radio, to which there was no response. Thereafter, petitioner's counsel indicated he had no further questions along this line.

The transcript indicates that the court then asked again if anyone had formed

an opinion as to the accused's guilt or innocence. The two veniremen, Mr. Hall and Mr. Labbe, who had previously indicated that they had, again responded in the affirmative. They were excused from jury service by the court.

Focusing at this juncture solely upon petitioner's allegation of prejudicial pretrial publicity, the Court finds that the record is devoid of any evidence to indicate that the *voir dire* examination was inadequate to safeguard petitioner's rights in this regard. Accordingly, the Court is satisfied that the trial court's refusal of the motion for a change of venue was proper and did not violate petitioner's constitutional rights.

## JURY SELECTION

The petitioner also alleges, however, that he was denied a fair and impartial trial by virtue of the trial court's denial of his challenges for cause as to several prospective jurors. He contends that since these veniremen admitted to being social or business acquaintances of the father of the prosecutrix for various periods of time, the trial court's refusal to strike them based upon their passive assurance that they could try the case without prejudice toward either the Commonwealth or the petitioner was improper.

The transcript of the *voir dire* examination indicates that petitioner's counsel, in addition to inquiring with regard to the venire's exposure to pre-trial publicity, also questioned the panel as to whether they had young children. Five of the initial twenty jurors called answered affirmatively, with one of the five, a Mrs. Quann, also stating that while she thought she could render a fair verdict, she was not sure. Upon further inquiry, another of the five prospective jurors in this group, apparently a Mrs. Beckwith, stated that she did not feel she could judge the matter impartially.

Next, petitioner's counsel asked if anyone on the panel knew Phillip Heflin, the father of the prosecutrix. At this point Mr. Ludlum, Mrs. Beckwith, Mr. Newman, and a Mr. Alsop and a Mr. Sprow, raised their hands. The following colloquy then occurred:

"Mr. Zwerdling [petitioner's counsel]: . . . Mr. Ludlum, how do you know Mr. Heflin?

The Juror: Through association perhaps some ten or twelve years.

Mr. Zwerdling: You have known him ten or twelve years?

The Juror: Yes, sir.

Mr. Zwerdling: Is that socially?

The Juror: Socially.

Mr. Zwerdling: And Mrs. [sic] Alsop, how about you, sir?

The Juror: I have been knowing him for six years.

Mr. Zwerdling: Six years?

The Juror: Yes, sir.

Mr. Zwerdling: Been knowing him business-wise or socially?

The Juror: Socially.

Mr. Zwerdling: Mrs. Beckwith.

The Juror: Socially.

Mr. Zwerdling: Mr. Newman.

The Juror: Approximately twenty years.

Mr. Zwerdling: And is that socially?

The Juror: Yes.

Mr. Zwerdling: And Mr. Sprow.

The Juror: Business.

Mr. Zwerdling: In what way, sir?

The Juror: Well, I see him come in the barber shop. I operate a barber shop here. He has been in there over the years.

Mr. Zwerdling: What line of business is Mr. Heflin in?

The Juror: Automobile salesman.

Mr. Zwerdling: Do you happen to know what company?

The Juror: I am not positive. I think it's Silvey Chevrolet."

The record reflects that at the conclusion of the examination of the initial panel, the court excused Mr. Newman, Mrs. Beckwith and Mrs. Quann.

Thereafter, the court directed that an additional ten veniremen be brought in. The trial court itself resumed the examination and, as previously noted, two members of the new panel, Mr. Labbe and Mr. Hall, indicated that they had formed an opinion with regard to the petitioner's guilt or innocence based upon what they had previously heard or read about the case. Petitioner's counsel then asked again if anyone knew Phillip Heflin. Six panel members, including Mr. Labbe and Mr. Hall, indicated that they did. Counsel then asked more specifically with regard to the other four veniremen:

"Mr. Zwerdling: . . . Miss Adams, how do you know Mr. Heflin?

The Juror: I am a neighbor.

Mr. Zwerdling: Mr. Redgraves.

The Juror: I know him.

Mr. Zwerdling: How long have you been knowing him?

The Juror: I guess thirty-five years.

Mr. Zwerdling: Do you know his family?

The Juror: (shaking head)

Mr. Zwerdling: Just him. Mr. Grinnan.

The Juror: I went to school with him.

Mr Zwerdling: Mr. Woodbridge.

The Juror: Done some work on his house.

Mr. Zwerdling: Did some work for him?

The Juror: Yes."

Counsel then inquired if anyone on the panel knew the prosecutrix, to which one member of the venire, Miss Adams, indicated that she did.

After some additional examination by counsel, again with regard to the venire's exposure to pre-trial publicity, the court excused Mr. Labbe and Mr. Hall. The court then directed the clerk to call twenty names from the jury list. The record in this matter indicates that of the twenty called, five prospective jurors, Mr. Sprow, Mr. Alsop, Mr. Ludlum, Mr. Woodbridge and Mr. Grinnan, had indicated on *voir dire* that they knew Phillip Heflin. Of those five, and, in fact, of the entire panel of twenty, counsel for the petitioner challenged for cause only Mr. Ludlum, Mr. Alsop and Mr. Sprow. The denial of those challenges are the subject of this aspect of the petitioner's claim.

■ Based upon the remarkably sparse record developed by petitioner's trial counsel with regard to those prospective jurors who candidly admitted their acquaintance with the father of the prosecutrix, the Court believes petitioner's allegations must be interpreted as a claim of inherent prejudice grounded solely upon those admissions. In effect, petitioner asks the Court to declare that a trial court's failure to strike a member of the venire panel who indicates some degree of familiarity with one related to a complaining witness constitutes error of constitutional dimension. This the Court will not do nor has it found any other court willing to go so far as to infer prejudice on so meager a record. See, *e. g., Keeny v. Swenson*, 458 F.2d 680 (8th Cir. 1972); *Durham v. Paderick*, 368 F.Supp. 342 (W.D.Va.1973).

Moreover, the Court has examined the state court record and finds that petitioner's trial counsel did not employ any of his four peremptory challenges to strike any of these three venire members he had just previously challenged for cause. While counsel might well have had other reasons for using his peremptory challenges in the manner which he did, this fact suggests that the degree of prejudice now alleged was not at all apparent at the close of the *voir dire* examination.

■ Finally, petitioner attempts to buttress his claim by arguing that the group *voir dire* examination utilized inhibited members of the venire from expressing their bias against him. The record itself contradicts this claim, however, since at least three panel members candidly admitted their inability to

render a fair and impartial verdict and were excused by the Court. Similarly, petitioner notes that the trial court refused to permit his trial counsel to question the venire as to whether they resided within two miles of the location of the alleged offense. In this regard, petitioner points to two Virginia statutes, sections 19.1–200 and 19.1–201 of the Code of Virginia (1950), which prohibit the empanelling of any juror in a criminal case to be tried in a circuit court of a *county* who resides within two miles of the place the crime is alleged to have been committed. While petitioner admits that the trial court was technically correct in ruling that those statutes were inapplicable to this matter, which was tried in the circuit court of a *city*, he suggests that the language employed in those statutes notes a legislative intent to preclude empanelling jurors who might potentially be prejudiced in the trial of a criminal case. Having made such an admission, and because the scope of review of this Court on a petition for a writ of habeas corpus is limited to matters contrary to the Constitution and laws of the United States, the Court is without authority to grant relief on this ground.

## PHOTOGRAPHIC IDENTIFICATION

Next, petitioner challenges his convictions as having been obtained by the use of an in-court identification which was tainted by an unnecessarily suggestive pre-trial photographic display. More specifically, he argues that the array of photographs displayed to the prosecutrix by Investigator Martin on January 27, 1973, improperly emphasized his likeness in that, of the seven photographs shown, his was the only one which contained four separate facial views. Based upon its own independent review of the photographic array in question, as well as the testimony adduced at petitioner's pre-trial suppression hearing concerning the method by which the array was presented to the prosecutrix, the Court finds that the identification in question was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

Moreover, even were the Court to assume, for the purpose of the instant petition, that the array itself or the method of presentation were suggestive, it finds that, under the "totality of the circumstances" the identification was reliable. *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In reaching this conclusion, the Court relies primarily upon the testimony offered during the course of petitioner's trial which indicated that: (1) there was sufficient lighting—both natural and artificial—existing at the time of the assault for the prosecutrix to have a clear and unobstructed view of her assailant; (2) the identification of the petitioner by the prosecutrix occurred but two and one-half weeks after the assault and only a few days after she had given the investigating officers a composite sketch of her assailant; and (3) her identification of the petitioner as her assailant both on January 27th and some seven months later at the petitioner's trial, despite the petitioner's having altered his appearance in terms of his weight and facial hair in the interim period, were without any reservation.

Accordingly, the Court finds no merit to petitioner's claim that his rights to due process of law were violated by the trial court's denial of his motion to suppress the identification testimony of the prosecutrix. Futhermore, in view of the Court's finding, it deems it unnecessary to consider petitioner's additional allegation that all which followed as a result of the identification by the prosecutrix—including his arrest, the taking of additional photographs at the time of his arrest, the search of his home and car and the items seized pursuant to those searches, as well as the identification of the petitioner by several other witnesses who testified to seeing him in the area where the crime was committed on the day in question—

was inadmissible at his trial under the principles enunciated in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ Finally, the Court considers it worthy of note at this juncture that while the petitioner has alluded to alleged single photograph pre-trial displays to other witnesses who testified at his trial, the record is void of any evidence to substantiate this claim. Moreover, although the trial transcript indicates that two witnesses who were unable to identify the petitioner at his trial were then shown the three photographs of the petitioner taken at the time of his arrest, following which they stated that he appeared to be the individual they had seen in the area of the crime, the petitioner's trial counsel neither objected to this procedure nor did he raise this matter on appeal. Therefore, pursuant to the exhaustion requirement of 28 U. S.C. § 2254, the Court is without authority to adjudicate this aspect of petitioner's claim.

## SEARCH AND SEIZURE

Petitioner's final claim centers upon his allegation that some of the evidence introduced at his trial was seized pursuant to an unconstitutional search of his home. Because this contention is clouded by a number of tangential issues, a review of the state court proceedings preliminary to considering the merits of petitioner's claim is in order.

On the morning of the day of his trial, petitioner's trial counsel moved the court to suppress all items which were seized on January 28, 1973, during the course of searches of his home at 1435 Minefee Street, Richmond, Virginia, and of his wife's automobile. Counsel indicated that while warrants had been obtained prior to the searches in question, the affidavit underlying the warrant for the search of petitioner's home had never been filed, as required by section 19.1–85 of the Code of Virginia (1950), with the clerk of the appropriate court in the City of Richmond. To support this contention, counsel attempted to introduce a letter which read as follows:

CIRCUIT COURT
OF THE CITY OF RICHMOND, VA.
DIVISION II
TENTH AND HULL STREETS
RICHMOND, VA. 23224

August 7, 1973

This is to certify that a search was made in the Clerk's Office of this Court of Affidavits for Search Warrants filed in this office from August 13th, 1971, to August 7th, 1973, and no such Affidavit for Search Warrant for the premises of 1435 Minefee Street, Richmond, Virginia, dated January 28th, 1973, was found.

Given under my hand this 7th day of August, 1973.

./s/ Iva R. Purdy, Clerk

The prosecution, however, objected to the admission of the document and, following argument, the trial court sustained the objection. At this point, petitioner's counsel requested a continuance so that he might subpoena Mrs. Purdy and the trial court denied the motion, indicating that all counsel needed to do was to have the document authenticated as the statute requires.

Thereafter, counsel called Investigator Martin who testified that he had filed an affidavit for each search warrant with the issuing magistrate in the City of Richmond. He indicated further that he did not file the affidavits with the Clerk of the Circuit Court of the City of Richmond. Petitioner's trial counsel, apparently reading from one of the affidavits, then questioned Investigator Martin on his statement, contained in the affidavit, that the warrant was requested on the basis of the identification of the petitioner by the prosecutrix. Martin testified that it was correct and went on to describe the manner in which the photographic array was displayed to the prosecutrix on January 27th. On cross-examination by the prosecution, Martin testified that it was standard pro-

cedure to leave affidavits for warrants with the issuing magistrate.

The transcript reflects that petitioner's counsel did not pursue his pre-trial motion to suppress nor did the trial court actually rule upon the motion. Rather, during the course of the trial, counsel indicated he was renewing his motion on the grounds that the affidavit supporting the search of petitioner's home was improperly filed. Again, the prosecution objected, arguing that there was no evidence admitted to show that the affidavits had not been filed as required by section 19.1–85 of the Code of Virginia. Thereafter, the trial court denied the motion to suppress on the grounds that the warrant and the inventory of items seized appeared to be sufficient on their face.

On appeal, petitioner assigned three errors with respect to this aspect of his case. They were: (1) the denial of this motion to suppress; (2) the sustaining of the prosecution's objection to the introduction of the letter from the Clerk of the Circuit Court of the City of Richmond; and (3) the denial of his motion for a continuance. All three grounds were denied by the Supreme Court of Virginia.

In the instant matter, petitioner contends that the introduction at his trial of the items seized on January 28th, as well as the introduction of hair samples taken at a later date, was designed to prejudice the jury and that it had little probative value. He also attacks the search warrants pursuant to which the items were seized, arguing that warrants for "mere evidence," as these were, are invalid in Virginia. Petitioner further contends that the trial court's failure to order the production of the affidavit for the search of his home effectively barred him from attacking the sufficiency of the affidavit itself. He suggests that once his trial counsel raised the issue of a potential fatal flaw with regard to the search and seizure, the burden then shifted to the prosecution to establish the legality of the search. Petitioner argues that the trial court's failure to recognize this fact violated his rights under the Fourth Amendment to the Constitution.

After reviewing the trial transcript and the petitioner's assignment of error to the Supreme Court of Virginia, the Court concludes that the petitioner has not satisfied the exhaustion requirement of 28 U.S.C. § 2254 with regard to his claims concerning the trial court's alleged abuse of its discretion in admitting certain items into evidence and the scope of the search warrants in question. Consequently, for the purpose of this petition, the Court will limit its inquiry to matters related to the basic thrust of the petitioner's motion to suppress which was the state's alleged failure to comply with section 19.1–85 of the Code of Virginia.

Section 19.1–85 provides in relevant part that an affidavit for a search warrant:

[S]hall be certified by the officer who issues such warrant to . . . the court clerk, admitting deeds to record, of his city and filed with such clerk within seven days after the issuance of such warrant and shall by such clerk be preserved as a record and shall at all times be subject to inspection by the public. . . .

Failure of the officer issuing the warrant to file the required affidavit shall not invalidate any search made under the warrant unless such failure shall continue for a period of thirty days but evidence obtained in any search shall not be admissible in court until a reasonable time after the filing of the required affidavit.

This statute has been interpreted by the Supreme Court of Virginia as setting forth requirements for obtaining a valid search warrant which are commensurate with those enunciated by the United States Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). See *Wiles v. Commonwealth,* 209 Va. 282, 163 S.E. 2d 595 (1968). Therefore, assuming for the moment that the affidavit in question had not been properly filed, the Court is satisfied that petitioner's constitutional rights were violated by the admission

against him at his trial of the items seized.

The Court finds, however, that any error of constitutional magnitude, if such was committed by the trial court in denying petitioner's motion to suppress, was harmless beyond a reasonable doubt. Cf. *Harrington v. California*, 395 U.S. 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). See also *Erving v. Sigler*, 413 F.2d 503 (8th Cir. 1969). Since the weight of the prosecution's case was so substantial in relation to items seized at petitioner's home and admitted at his trial—which consisted of two pairs of men's trousers—the Court must conclude that the jury's determination would not have been altered had this evidence not been produced.

Accordingly, the Court finds the state court records adequate for determining petitioner's claims and, therefore, will dispense with a plenary hearing. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Finding no basis upon which petitioner's convictions should be overturned, the Court will deny the petition for a writ of habeas corpus and will dismiss this action.

An appropriate order will issue.